W. A. BROWN et al. v. ROBINSON BROWN.

*Petition to Rehear.*

1. The statute (Acts 1794, 1 Pot. Rev., ch. 423) amendatory of the statute (Acts 1784, 1 Pot. Rev., ch. 202), rendered the lands acquired by this State by the treaty of Holston from the Cherokee Indians, subject to entry and grant.

2. The judgment entered in this case at the September Term, 1888, of this Court, is set aside, and a new trial is ordered, because of the act of 1791 (Haywood's Manual, p. 188). which was not called to the attention of the Court when the case was first argued.

MERRIMON, J. This is an application to REHEAR the case of *Brown* v. *Brown*, decided at the last term. From the opinion of the Court delivered in that case, it will plainly appear that its decision was founded upon the ground that the treaty of Holston, ratified the 11th of November, 1791, referred to very fully, had not the effect to repeal or modify the statute (Acts 1783, 1 Pot. Rev., ch. 185) settling and prescribing the boundary of lands of the Cherokee Indians, and absolutely forbidding the entry and grant of any land within that boundary. The counsel for the appellants, on the argument of the appeal, insisted strongly that the treaty had such effect, and cited *Strother* v. *Cathey*, 1 Murph., 162, and other cases, in support of their contention. It was not contended or suggested that there was any statute or statutory provision that repealed or modified the statute cited above—none was called to our attention—nor did our protracted and industrious researches in the course of reaching a conclusion enable us to find one. In the absence of such repealing or amendatory statute, unquestionably the decision of the Court was correct, and this is now freely conceded by the learned counsel of the appellants.

But it is alleged in the petition to rehear, and earnestly contended by counsel, that the treaty mentioned certainly

extinguished the title or claim of the Cherokee Indians to
the land embraced by it in favor of this State, as far to the
west as the " Meigs and Freeman line," and that the State
owned it as part of its vacant lands, at once upon the ratifi-
cation of the treaty; that the statutes enacted subsequently
to that treaty creating the county of Buncombe, which em-
braced all the land of the Cherokee Indians in this State,
had the implied effect to render such vacant lands subject
to entry and grant; and as the entry of David Allison,
embracing part of such vacant land, was made on the 4th
day of May, 1795, in the county of Buncombe, and the grant
thereupon issued to him on the 29th of November, 1796, it
must be valid and operative. The statute. creating the
county of Buncombe did not mention or refer to it—certainly
did not in terms—the statute first above cited forbidding
the entry and grant of lands within the boundary of lands
of the Cherokee Indians, nor is any reference made in it to
such lands. That county was simply created on a footing
with other counties of the State as to the entry of lands,
except that it embraced all the lands of the Cherokee Indians
in this State, as, perhaps, the counties of Rutherford and
Burke did, to some extent, before that county was created.
It is very questionable whether such strained interpretation
of this statute could be allowed, encouraged by strong
attending circumstances favoring it; but the discovery of a
statute, presently to be mentioned, has relieved us from
deciding that it could or could not be.

There are several collections of the older statutes of this
State. All of them are more or less imperfect. Some give
but a summary of the statutes, while others give such parts of
them as were deemed important. The citations in all the
collections are more or less complicated and confused. It is
not, therefore, surprising that it is sometimes difficult to find
an old statute that long since ceased to be current, and yet it
continued to be important and effectual in some connections

and for some purposes.  Being strongly impressed with the belief that there was some enactment shortly after the State acquired the lands, the Indian title to which was extinguished by the treaty of Holston, we have, in addition to the industrious research of counsel for the like purpose, scrutinized all the statutes passed after the year 1791, and have found one, consisting of four lines, that extended the provisions of another prior statute, and thus, by clear implication, intentionally subjected the lands in question to entry and grant.  It is singular, that so large and important an acquisition of lands by the State was not made the subject of express legislation.  They seem to have been neglected by the Legislature for a long while, but to have been watched by a few persons, who obtained grants for much the greater part of them, a single grant, in some instances, embracing hundreds of thousands of acres.  The grant in question embraced two hundred and fifty thousand two hundred and forty acres.  Why these lands were not regarded with more seriousness by the Legislature is left largely to conjecture.  It may be, it supposed they were on a footing with other lands of the State subject to entry and grant, but this could not be so in the face of express statutory provisions forbidding the entry of them, while such provision remained without repeal or modification by statutory provision.

The statute (Acts 1784, 1 Pot. Rev., ch. 202) required that surveyors, in the " eastern part of the State," should survey for any person or persons whomsoever, his or their entries of land already made or that hereafter may be made in or adjoining any of the great swamps (be the number of entries more or less), in one entire survey, &c.,  * * *  and, " that when two or more persons shall have entered, *or may hereafter enter* lands, jointly," &c., " the surveyor may survey two or more entries as one," &c.  The provisions of this statute were afterwards extended by the statute (Acts 1794, 1 Pot. Rev., ch. 422; Haywood's Manual, p. 188), which provided as fol-

lows: "*Be it enacted, &c.:* That all the lands in this State, lying to the *eastward of the line of the ceded territory*, shall be deemed and considered as coming within the meaning and provision of the said act."

By " all the lands in this State lying to the eastward," &c., is meant all the lands of this State not specially devoted to some particular purpose, and the implication intended was, that they should be subject to entry and survey just as were the lands mentioned in the statutes amended. Such lands— "all the lands in this State lying," &c.—were to " be deemed and considered as coming within the meaning and purview of said act," that is, they were all deemed alike subject to entry. Otherwise, a part of the land would be excepted from the act, and this the express and sweeping words employed would not allow. And it seems that, particularly, there was a purpose to embrace the lands so acquired from the Cherokee Indians. Hence, the words, "lying to the eastward of the line of the *ceded territory.*" That was the line which separated this State from the territory ceded by it to the United States (Acts 1789, 1 Pot. Rev., ch. 297), which now forms the State of Tennessee, and the land acquired from the Indians, by the treaty of Holston, lay immediately to the eastward of a part of that line. If the purpose of the brief statute just recited had been to omit this land, the proper language would have been, "all the lands in this State subject to entry," and the words, "lying to the eastward of the ceded territory," would have been omitted. These words were used advisedly, it seems, and intended to have force, and serve the purpose we attribute to them in connection with the other words employed.

This interpretation is strengthened by the fact, that the county of Buncombe had been created before that statute was enacted (Acts 1791, ch. 52), embracing the Indian lands, and it had an entry office like other counties of the State. The State owned these lands, having acquired them through the United States by the treaty of Holston, and they had

not been devoted to any particular purpose. They were vacant and might be disposed of as the Legislature might direct. Moreover, the statute (Acts 1809, Pot. Rev., ch. 774), seems to imply that the lands so acquired had theretofore been subject to entry and grant, as it expressly provided "that the land lying west of the line run by Meigs and Freeman, within the bounds of this State," (and we add immediately west of the land so acquired by this State) "shall not be subject to be entered under the entry laws of this State," &c., and other subsequent statutes seem to have had the like implication, making no mention of the lands now referred to.

It was certainly understood among the people and the authorities of the State after 1794, that the lands thus acquired from the Indians were subject to entry and grant. So far as we are informed and can learn from the most diligent search and scrutiny, made by counsel and the Court, there is no statute, other than that we have referred to, that allowed such entry and grant. It has not such clearness and directness as it might, not unreasonably, be expected to have; but we think the interpretation we have given it is reasonable and the proper one. We may add, that it is fortunate that it has been discovered, as it rendered the land subject to entry and makes valid and sustains the grant in question, under which, no doubt, many excellent people derive title to their land. We are glad to correct an error attributable to the singular character of the statute pertinent, and the unavoidable embarrassment encountered in finding it among a vast number of very old uncurrent statutes.

The prayer of the petitioners must, therefore, be granted. The case must be reheard, and the judgment of this Court, entered therein at the September Term of 1888, must be set aside, and judgment entered declaring that there is error, and directing a new trial to be had.

*Prayer of the petitioners granted.*