W. A. BROWN et al. v. ROBINSON BROWN.

*Cherokee Lands—Grants—Treaties with the Indians—Holston Line—Act of Legislature—Boundaries—Color of Title—Evidence—Bond for Title—Possession.*

1. By an act passed in North Carolina in 1777, it was made lawful for any citizen of the State "to enter any lands not granted before the fourth day of July 1776, which have accrued or shall accrue to this State by treaty or conquest." An act passed in 1783 reserved to the Cherokee Indians certain lands, and forbade entry or survey, making void all grants issued thereon. By a treaty made in 1791, all Indian titles east of the "Holston Treaty Line" were extinguished: *Held* (1), that the Legislature had the right to fix and declare the boundaries of this line without affecting the rights of third parties interested; (2) the State cannot, without a breach of faith, question such location of boundaries; (3) nor private individuals claiming under it; (4) the State has fixed and declared such boundaries; (5) the Holston line was ascertained and made certain by the Meigs and Freeman survey; (6) a grant of land by the State, depending for its validity upon the location of the boundaries so fixed and declared, is good.

2. A witness called to prove the declaration of an aged man, then dead, is not rendered incompetent because his wife claimed land under the grant.

3. A deed is good to show color of title, though improperly admitted to registration.

4. When the record shows that the execution of a deed was duly acknowledged before a Judge of the Superior Court in 1860, and it was properly registered in obedience to this fiat, but it did not appear in which of two counties, Haywood or Jackson, and that there was a certificate of registration in Jackson County, dated October, 1882: *Held*, the deed was properly registered.

5. A will directed: " And in relation to the 'speculation lands,' it is my will and desire that the sale shall continue under the management of my executors as though I was living': *Held*, the lands being identified, the executors had a right to sell.

6. One J. went into possession of a tract of land in 1873, under a bond for title, which he assigned to plaintiffs, who took in 1874, and continued until 1881 or 1882, deed being made to them in 1875, conveying to them by metes and bounds. The possession of both was adverse and continuous: *Held*, title was good against all persons but the State.

CIVIL ACTION, to recover land in Jackson County, removed for trial to MACON County, and tried before *Clark, J.*, at Fall Term, 1889 of the Superior Court of said county.

The facts are stated in the opinion.

*Messrs. M. E. Carter* and *T. F. Davidson*, for plaintiff.
*Mr. G. H. Smathers*, for defendant.

DAVIS, J.: The plaintiffs claim title through a chain of conveyances, the first link in which is a grant from the State to David Allison, dated November 29, 1796, but having failed, under the ruling of the Court below, by reason of defective links in the chain, to connect themselves with this grant, they rely upon seven years' possession, under colorable title, and the grant of David Allison is only relied upon to take title out of the State.

The defendant relies upon a grant from the State, issued the 2d day of February, 1882. The action was instituted at Fall Term, 1882, of the Superior Court of Jackson County.

The record contains numerous exceptions, most of them relating to alleged defects in the grant from the State to David Allison and to the various intermediate conveyances offered in evidence; but as the objections to the validity of the Allison grant " on its face" are withdrawn, and the exceptions taken on the trial in regard to the intermediate conveyances are rendered immaterial by the ruling of his Honor that there were "breaks in the plaintiff's chain of title, and that plaintiffs had to rely on seven years' possession," we need only consider the exceptions which relate to the sufficiency of the Allison grant to take the title to the land in controversy out of the State, and if so, to the plaintiff's claim of seven years' possession under colorable title.

By an act passed in 1783, reserving to the " Cherokee Indians and their nation forever," certain lands bounded and described therein, it is, among other things, declared that " no person shall enter and survey any land within the bounds so set apart," under a penalty of fifty pounds for every such entry; and it is further declared that " all entries and grants thereupon, if any should be made, shall be utterly void." There are numerous other acts and provisions relating to the Cherokee lands to be found in chapter 10, § 2346 *et seq.*, of *The Code*. It is insisted that the Allison grant is of land within the Indian boundary, and is void under the Act of 1783.

By an act passed in 1777, chapter 114 (1 Potter's Rev., 274), it is made lawful " for any person who is, or shall hereafter become, a citizen of this State," &c., to enter any lands which have not been granted, &c., before the 4th day of July, 1776, " which have accrued, or shall accrue, to this State by treaty or conquest," &c. The Cherokee lands

were, by the Act of 1783, reserved to the Cherokee Indians and their nation forever, and it is declared that all grants of such lands shall be "utterly void." The treaty of Holston was made July 2, 1791, and extinguished the Indian title thus reserved to all land east of the Holston treaty line. Whether this treaty had the effect *ipso facto* to open the land in question to entry and grant, as any other. land acquired by treaty or conquest, or whether, as no act has been passed repealing, in express terms, the Act of 1783, it was, by impli- cation, repealed by chapter 42, § 1 of the Revised Statutes, *The Code*, § 2751, or by the Act of 1852, *The Code*, § 2465 *et seq.*, we need not consider; nor, so far as the case before us is concerned, need we consider the questions so elaborately and ably discussed by Mr. Smathers, in his learned brief, relating to the several treaties with the Indians and the Holston boundary line, for (certainly and unquestionably before the rights of any third parties intervened) it was in the power of the Legislature to fix and declare where the boundary line (in regard to which dispute existed) was; and whatever might be its effect upon rights that may previously have accrued, the State itself could not, without breach of faith, thereafter question the location, nor can any one claiming under the State by a subsequent grant be heard to question it. Has the State so ascertained and fixed the boundary line?

The Act of 1819 (*The Code*, § 2350, *et seq.*) provides "the manner in which lands lately acquired by treaty from the Cherokee Indians shall be disposed of." The lands thus referred to are those to which the Indian title had been recently extinguished by the treaty of April 8th, 1816, and February 27th, 1819, and lay west of the Meigs and Free- man line, and, if the position insisted upon by the defend- ant be correct, no provision was made after 1791 for the dis- position of the lands lying between the lines insisted upon by him as the true Holston treaty line and the Meigs and

Freeman line; but assuming that the true treaty line was as run and fixed by the Meigs and Freeman survey, made after the treaty, which left the location of the line a subject of dispute (and this seems clearly to have been the understanding of the Legislature), then the lands east of the Holston treaty line, fixed and made certain by the Meigs and Freeman line, had already been subjected to entry and grant, and leave no room to suppose that the Legislature was inexplicably negligent of its duty in regard to the disposition of the large area of land belonging to the State. The treaty of Holston, made July 2d, 1791, extinguished the Indian title to "all lands lying to the right" (east) of the Holston treaty line, and it seems clearly to have been the early legislative understanding that this line was fixed and made certain by the Meigs and Freeman line, and this has been sanctioned by the Act of 1889, ch. 234. *Lattimer* v. *Potest*, 14 Peters, 4, so far from conflicting with this view, we think sustains it.

That case decides, in conformity with many previous adjudications, that entries and grants of land within the limits of the Indian territory, before the Indian title was extinguished, are void, but the action grew out of the uncertainty as to the Indian boundary line, and the Court distinctly recognizes the power of the parties to the treaty to determine any dispute touching boundary lines, and designate where they are. And in *Patterson* v. *Jenks*, 2 Peters, 216, the Court, in reference to a treaty with the Creek Nation in Georgia, declares that, "if the State of Georgia has construed this treaty by any subsequent acts manifesting her understanding of it, we should not hesitate to adopt that construction in this case." In that case the "bill of exceptions" contained no fact which would show that Georgia had adopted the construction of the treaty which would establish the boundary claimed. Afterwards, in *Lattimer* v. *Potest, supra*, Mr. Justice CATRON, in his concurring opinion, quoting *Patterson*, v. *Jenks*, that plainly recognized the right of North

Carolina to construe the Holston treaty for herself, and settle the boundary, and the line so settled would be adopted, but the bill of exceptions in that case, as in the case from Georgia, set forth no fact from which it could be seen that North Carolina had manifested "her understanding of it," and there is no judicial opinion, we think, in conflict with this. Many lines were run, and at different times, between the Indians and the whites, and it is said: "The truth is not open to question that the Holston treaty line never was ascertained southeast of the Iron Mountain, * * * and the United States having ceased to have any interest in its ascertainment after the treaty of Tellico (1796) was made, North Carolina had a right to ascertain and settle it for herself, according to some construction of the treaty of 1791, and by which her grantees would be bound if so settled," &c. But we need not pursue this branch of the subject by reviewing the authorities, nor need we consider whether, from the surveys and maps contained in the scientific report of J. W. Powell, Director of the Bureau of Ethnology to the Government, the Holston treaty line can be ascertained with mathematical certainty, and has become a question of law and science, instead of a question of fact for the jury, for we regard the question as settled by this Court, 103 N. C., 221, where, citing the act of 1794 (1 Potter's Rev., ch. 422), it is said: "By 'all the lands in this State lying to the eastward,' &c., is meant all the lands of this State not specially devoted to some particular purpose, and the implication intended was that they be subject to entry and survey, just as were the lands mentioned in the statute amended," &c. And again it is said: "The statute (Acts 1809, Potter's Rev., ch. 774), seems to imply that the lands so acquired had, therefore, been subject to entry and grant, &c., and it was certainly understood among the people and the authorities of the State that. after 1794, the lands thus acquired from the Indians were subject to entry and grant."

The Meigs and Freeman line ascertained and fixed the hitherto uncertain line of boundary between the State and the Indians, and the line thus settled, so far as the State or any one claiming under it is concerned, ought not to be re-opened. It does not change the Holston or any other Indian treaty line, but the State had a right for itself, and all claiming under it, to say and settle where the true boundary line was, and this having been done by the act of 1809, the question should be at rest.

We think it settled in this case (103 N. C., 221), that the Allison grant was valid to convey the State's title to the lands embraced therein lying east, and not west, of the Meigs and Freeman line, and this disposes of the several exceptions, without specifying them in detail, based upon the alleged invalidity of that grant.

We think that Mr. Lusk was not rendered incompetent as a witness to testify to the declarations of an aged man, now dead, as to a corner tree of the Allison grant, by reason of the fact that his wife claimed land under that grant; but the jury having found as a fact that the land in question was not on the south or west of the Meigs and Freeman line (in fact, we believe it is conceded to be east of the Meigs and Freeman line), it becomes immaterial, and the only remaining question is, have the plaintiffs, and those under whom they claim, had seven years' possession under colorable title?

The p'aintiffs offered in evidence a deed from J. B. Sawyer, Clerk and Master in Equity of Buncombe County, dated December 22d, 1859, to James R. Love, and executed in pursuance of a decree of the Court of Equity of said county, in certain proceedings had therein between James Gudger and others, plaintiffs, and James R. Love and others, defendants. The admission of this deed was objected to upon the ground that said deed had been improperly admitted to reg-

istration in the counties of Haywood and Jackson without any order of the Probate Court of said counties.

This objection was overruled, and the defendant excepted.

The record shows that the execution of the deed was duly acknowledged by the grantor before James W. Osborne, a Judge of the Superior Court of law, on the 13th day of October, 1860, and, in obedience to this *fiat*, was properly registered November 7th, 1860, but whether in Jackson or Haywood County does not appear from the record. There is also a certificate of registration in Jackson County, dated October 16th, 1882.

We think the deed was properly registered. *Sellers* v. *Sellers*, 98 N. C., 13.

In any event, whether properly registered or not, it was good as color of title, and the objection was properly overruled. *Davis* v. *Higgins*, 91 N. C., 382.

The plaintiffs then offered in evidence a certified copy of the will of James R. Love. This was objected to upon the grounds—1st, " that no authority was conferred by the said will upon the executors of said Love to sell any lands, the terms of the same being too vague and uncertain to give such authority; and 2d, that the same is irrelevant." The objection was overruled, and the defendant excepted.

James R. Love, by his will, a copy of which is sent with the record, directs: " And in relation to the 'speculation lands,' it is my will and desire that the sale shall continue under the management of my executors as though I was living," &c.

It was in evidence that the lands in controversy were a part of the lands known as the " speculation lands," and the executors under the will had authority to sell, and the objections were properly overruled.

The plaintiffs then offered in evidence a deed from the executors of James R. Love to them, dated October 28th, 1875, covering the land in dispute. This was objected to as

irrelevant.   The objection was overruled, and defendant excepted.

This is the deed under which the plaintiffs directly claim, and we are unable to see any ground upon which the objection can be maintained.

It was in evidence that one Javan Davis took possession of the land in controversy under a bond for title in March, 1873, built a house thereon, and cultivated the land; that he assigned his bond for title to W. A. Brown (one of the plaintiffs); that Brown took possession under this assignment in 1874, and continued in actual possession until 1882; that on the 28th October, 1875, the executor of James R. Love executed a deed to the plaintiffs (a copy of which is sent with the record), conveying the land in question by metes and bounds.   There was evidence on behalf of defendant that he took possession in March, 1881.

The Court instructed the jury "that, if they find that Javan Davis went into possession of the *locus in quo* in 1873 under bond to make title from the executors of James R. Love, his possession was Love's possession and under Love's color of title; and if he had continuous and adverse possession up to time of assignment of bond for title to plaintiffs, and plaintiffs then took and held continuously adverse possession up to March, 1881, when defendant claimed that he took possession, then plaintiffs and those under whom they claim had more than seven years' possession, and would have title against everybody except the State."

The Court explained the nature of the possession required to the jury, and told them that the burden was on the plaintiffs to prove it.

There is no error in this charge of which the defendant can complain.

The possession of Javan Davis and his assignee under bond for title was the possession of the vendor, under whom they claim, until the purchase-money was paid, and the pos-

session of part of the tract within the metes and bounds set out was the possession of the entire tract.

A tenant, though he may lease a small and definite boundary in a large tract of land, holds possession for his lessor, and his possession enures .to the benefit of the lessor as to the whole of the land covered by the deed under which he claims title. *Ruffin* v. *Overly* (decided at this term), and cases there cited.

A vendee in possession under a contract of purchase is in privity with his vendor, and is entitled to have the time when he held possession under his vendor added to that after receiving his deed in determining whether colorable title was matured into a perfect title by possession. The possession of the plaintiffs under contract for title was, up to the time of the execution of the contract and taking of the deed, the possession of their vendors, and enured to the benefit of the vendees just as if they were tenants of the particular tract of land contracted to be sold, and after the deed to them the possession under color continued. So that, if, from the time that actual possession was taken by Javan Davis under the executors of Love, in whom was color of title, there was continuous possession, the colorable title of plaintiffs and those under whom they held was ripened into perfect title. *Avent* v. *Arrington* (decided at this term), and authorities cited.

Affirmed..