BEALMEAR v. HUTCHINS et al.

(Circuit Court, W. D. North Carolina. November Term, 1904.)

1. PUBLIC LANDS—CHEROKEE LANDS OF NORTH CAROLINA—MANNER OF PRIVATE ENTRY.

The lands acquired by the state of North Carolina by treaties between the United States and the Cherokee Indians, known as "Cherokee Lands," lying west of the line run by Meigs & Freeman in 1802, were by the subsequent legislation of the state to and including 1852 kept separate and distinct from the public lands of the state, and were not subject to private acquisition under the general entry and grant laws, but only under special laws applicable to them alone, and grants issued upon and entry of such lands under the general laws are unauthorized and void, and convey no title.

2. SAME.

The provision of Rev. St. N. C. 1837, c. 42, § 1, that "it shall not be lawful for any entry taker to receive an entry for lands lying to the westward of the line run by Meigs & Freeman in the year 1802, * * * except the vacant and unsurveyed lands that have been acquired by treaty from the Cherokee Indians in the years 1817 and 1819," if construed to authorize the entry of any of the Cherokee lands under the general entry and grant laws then in force, casts the burden upon

134 F.—17

one claiming under such an entry to show on the face of the grant itself that the land was at the time "vacant and unsurveyed," and so within the exception.

3. SAME—VALIDITY OF GRANT.

Under the law of North Carolina in force in 1852 (Rev. St. 1837, c. 42, § 4), which authorized the justices of the peace of a county, when they deemed it necessary, to elect one person "to receive entries of claims for lands within such county," an entry taker had no authority to receive an entry of lands lying in another county, and a grant based on such an entry is void.

4. SAME—CONSTRUCTION OF STATUTE—POWERS OF ENTRY TAKER.

Pub. Laws N. C. 1850–51, p. 99, c. 39, which extended the jurisdiction of the courts and sheriffs of Macon and Haywood counties over the territory of the newly created county of Jackson, and also the authority of the "justices of the peace, constables, and other public officers heretofore appointed and living within the territory of Jackson," cannot be extended by construction to extend the authority of the entry taker of public land claims of Macon county over lands lying in Jackson county, when he is not shown to have resided within such county.

Action of Ejectment.

George H. Smathers, for plaintiff.
James H. Merrimon, for defendants.

BOYD, District Judge. This is an action of ejectment, brought by the plaintiff, who seeks thereby to recover two tracts of land, each containing 640 acres, alleging that he is the owner and entitled to the immediate possession thereof, and that the defendants are in wrongful possession. Defendants in their answer deny plaintiff's title. The lands are now located in Swain county, N. C., but at the time of the entries and grants hereinafter mentioned they were located in Jackson county, N. C.; Swain being a new county, since erected from part of the said county of Jackson. The issues which arise upon the pleadings are these: First. Is the plaintiff the owner in fee, as alleged in his complaint, of the land described therein, and entitled to the possession thereof? Second. Are the defendants in the wrongful possession, as alleged in the complaint? Third. What damage is the plaintiff entitled to recover?

After the jury was impaneled the plaintiff, in order to prove his title, offered in evidence two grants from the state of North Carolina to one J. L. Moore, each dated January 5, 1854. These grants showed upon their face that they were based upon an entry dated the 26th day of July, 1852, and that the amount per acre paid to the state by the grantee was 10 cents. Attached to the grants are copies of the survey of the entries, from which it appears that the surveys were made by the surveyor of Jackson county, by virtue of a warrant from the entry taker's office of Macon county. The surveyor certifies that he has surveyed each of the 640-acre tracts of land "in the county of Jackson, in which said lands now lie, October 31, 1853." The defendants objected to these grants as evidence, on the ground, first, that they were void, for the reason that the lands embraced in them were a part of the lands acquired by the state of North Carolina, under the treaties of 1817 and 1819 between the United States and the Cherokee Nation of Indians,,

which lands, as defendants insist, were not subject to entry and grant under the general laws of the state of North Carolina at the date of the said entries, to wit, July 26, 1852, and could only be acquired by citizens of the state, at said date and at the date of the said grant, under and in pursuance of the provisions of the special legislation of the state in relation to the said lands; and, second, because of the fact, as appeared upon the face of the grants, that said grants were issued for lands located in the county of Jackson, upon entries and warrants made and issued by the entry taker of Macon county. The counsel for the plaintiff admits that these grants are the sole basis of his title, and, if they are invalid, he cannot recover, and that the lands covered by the grants were a part of what were known as "Cherokee Lands."

In the course of the very learned and exhaustive discussion of the question of the validity of these grants, the counsel have furnished the court with the treaties made between the United States and the Cherokee Indians, under which these lands were derived to the state of North Carolina; also the several acts of the General Assembly of North Carolina, both general and special, pertaining to the Cherokee lands; and, in addition thereto, numerous decisions of the Supreme Court of the state in relation to the question involved. It is well to state, in the outset, that the lands of which those in controversy are a part, from the earliest history of the treaties in relation thereto between the United States and the Cherokee Nation of Indians, were known as and called "Cherokee Lands," and the General Assembly of the state of North Carolina, by special acts and provisions of acts, put them upon a special and different footing from all other public lands in respect to the method of their disposition to private individuals. The following is a history of this legislation:

The first act that needs to be noticed is that of 1783, found in 1 Potter's Revisal, c. 185, §§ 5–8. By this act no land within the boundary allotted to the Indians could be entered or granted. The next act was passed in 1809, and was entitled "An act to prevent speculations in obtaining lands which may hereafter accrue to this state by purchase from the Indians." It provides, first, that the land lying west of the line run by Meigs & Freeman, within the bounds of this state, shall not be subject to be entered under the entry laws of this state, but the same, when the Indian title shall be extinct, shall remain and inure to the sole use and benefit of the state, any law to the contrary notwithstanding; second, that all entries made or grants obtained, or which may hereafter be made or obtained, shall be null and void. See chapter 774, 2 Potter's Revisal. In 1817 an act was passed, supplementary to the one last cited, forbidding entries west of the Meigs & Freeman line, in Haywood county, under a heavy penalty. 2 Potter's Revisal, c. 950. Then came the act of 1819 (2 Rev. St. 1837, p. 189), entitled "An act prescribing the mode of surveying and selling the lands lately acquired by treaty from the Cherokee Indians." By the fifth section of this act, after providing for the laying off into sections of

as much of the land as would sell for 50 cents per acre, it is declared:

"That the residue of said lands shall be reserved for the future disposition of the Legislature, and that no part or portion thereof shall be liable to be entered in the entry taker's books for the county of Haywood, or elsewhere, until provision be made by law for the disposal thereof; and entries heretofore made or grants obtained, or which hereafter may be made, otherwise than as provided by this act, be, and the same are hereby declared to be, utterly void and of none effect."

This section was continued in force by section 5 of the act of 1826. 2 Rev. St. 1837, pp. 201, 202. The act of 1819 was recognized by the act of 1828. 2 Rev. St., p. 204. The act of 1836 (2 Rev. St., p. 209) is a replica of the act of 1819, and the act of 1819 was brought forward as an existing and unrepealed law in 2 Rev. St. 1837, by express authority of section 10 of "An act concerning the Revised Statutes," ratified the 23d day of January, 1837. See 1 Rev. St. 1837, c. 1, § 10. By chapter 90, p. 194, Pub. Laws 1848–49 (section 7), it is provided:

"That all the bonds due the state for the sales of Cherokee lands, and all judgments rendered on such bonds, together with all the lands, sold and unsold, when the purchase money has not been paid, in the counties of Cherokee, Macon, and Haywood, are hereby pledged for the making of said road a turnpike road from Salisbury west to the line of the state of Georgia."

Here we find the Legislature of North Carolina, as late as the session of 1848–49, appropriating the proceeds from the sales of Cherokee lands, in the counties of Cherokee, Macon, and Haywood, to the construction of a turnpike road from Salisbury, N. C., west to the Georgia line, and, as will be observed, the act making the appropriation does not refer to funds derived from the granting of Cherokee lands, under the general entry and grant laws of the state, but to bonds due the state for the sale of Cherokee lands and judgments rendered on such bonds. Now, under the general entry and grant laws there could be no bonds to the state for the entry price, for that was established at 10 cents an acre, to be paid in cash; and, further, it will be seen that the special acts of the Legislature, authorizing the entry and grant of what were known as the "Cherokee Lands," classified them, and established a price for the first, second, third, and fourth classes. None of them were placed as low as 10 cents per acre, which, as before stated, was the price for land under the general law of entry and grant. It is thus clearly shown to the mind of the court that the Cherokee lands, up to the time of the passage of the act of 1848–49, were being disposed of under what were known as the "Cherokee Land Laws," and not under the general entry laws of the state. Then follows chapter 23, p. 62, § 3, Pub. Laws 1850–51, which defines what evidence shall be sufficient to authorize the Secretary of State to issue a grant for any tract of land lying in Haywood, Macon, or Cherokee county:

"The receipts of the agent of the state for the collection of Cherokee bonds, * * * together with the proper certificate of sale, transfer, deed, or warrant and certificate of survey, shall be sufficient evidence on which the Secretary of State may issue a grant to the purchaser or enterer of said tract of land."

The act of 1852, after providing for an entry taker for Cherokee county, and fixing the price of the lands in that county, and prescribing the methods by which private individuals might obtain grants for them, declares:

"That all the vacant lands in the county of Macon and Haywood may be entered under the provisions of this act, at the present rates, and all lands in said county heretofore entered and not paid for may be paid for as herein provided for the lands lying in Cherokee county," etc.

This manifestly means that all lands that had been entered under the Cherokee land laws, prior to the passage of the act, might be paid for as provided for the lands lying in Cherokee county. Pub. Laws 1852, c. 169, p. 616. This act was ratified December 27, 1852, and it will be noted that no mention is made in it of the lands lying in Jackson county, although that county was created by an act ratified the 29th day of January, 1851.

Lastly comes the act of 1855 (chapter 22, p. 46, Pub. Laws 1854–55), ratified the 15th day of February, 1855. This act is "supplemental to and amendatory of" the act of 1852 above cited. There is enough in this act of 1855 to show what construction the General Assembly put upon all previous legislation in relation to the Cherokee lands. By section 9 the provisions of the act of 1852 are extended to the county of Jackson.

The plaintiff's counsel relies upon the general law of the state in relation to entries and grants. He asserts that his entry was made and his grant obtained upon the authority and power conferred by chapter 42, 1 Rev. St. 1837. He insists that by section 1 of that chapter the vacant and unsurveyed lands lying to the westward of the line run by Meigs & Freeman in the year 1802 were subject to entry. The language of that section is:

"It shall not be lawful for any entry taker to receive an entry for lands lying to the westward of the line run by Meigs and Freeman in the year 1802, * * * except the vacant and unsurveyed lands that have been acquired by treaty from the Cherokee Indians in the years 1817 and 1819."

Now, if it be granted that this provision authorized the entry taker to receive entries of such "vacant and unsurveyed lands," it by no means follows that such entries should be proceeded upon as entries of the public domain. Such entries would serve only to give the enterer a right to be preferred to any subsequent enterer in obtaining a grant by complying with the laws especially applicable to the Cherokee lands. Hall v. Hollifield, 76 N. C. 476, 477. It is not said that such vacant and unsurveyed lands shall be put upon the same footing as the public lands of the state. By the "Act concerning entries and grants," passed in 1855 (Pub. Laws 1854–55, p. 44, c. 18, § 31) it is declared:

"Nothing contained in this chapter shall apply to the lands commonly known as and called 'Cherokee Lands,' but the said lands are to be disposed of and regulated according to the laws in relation thereto."

Here the Legislature distinctly recognized the existence of special laws relating, not to some particular part of the said lands, but to all the lands "commonly known as, and called, 'Cherokee Lands,'" and that these special laws made provision for the disposal of said

lands by a method different from that for the disposal of the public lands of the state. There seems, therefore, to be no question that there were special laws for these lands, providing a method for their disposal differing from the general entry and grant act, and these laws would prevail, even against a provision of the general law by which a method for their disposal was provided. See State v. Stoll, 17 Wall. 425, 21 L. Ed. 650; U. S. v. Nix, 189 U. S. 205, 23 Sup. Ct. 495, 47 L. Ed. 775, citing with approval Magone v. King, 51 Fed. 525, 2 C. C. A. 363, and Townsend v. Little, 109 U. S. 504, 3 Sup. Ct. 357, 27 L. Ed. 1012.

Where authority to issue a grant is special, in order to validate action under the authority, it must be shown that the prescribed state of facts existed. The acts of assembly relating to the sales of Cherokee lands, prior to 1852, confer special authority and jurisdiction to give effect thereto, and a grant issued by virtue of these acts, in order to be effective, must be strictly in compliance with the provisions of said acts. Harshaw v. Taylor, 48 N. C. 513. This case is cited and approved in Gilchrist v. Middleton, 107 N. C., foot of page 679. It will be observed that the principle here settled is not merely that where the officer has no authority his act is void, but the act is void where the officer "exceeds" his authority. Where a deed is executed in face of a statutory prohibition, it is void, and may be attacked on a trial for possession. Averitt v. Elliott, 109 N. C. 562, 13 S. E. 785. If land is not subject to entry, the entry and the grant based upon it are both void. Stanmire v. Powell, 35 N. C. 312. This case has been followed down to Holley v. Smith, 130 N. C. 85, 86, 40 S. E. 847.

It will be seen from the cases of Kimsey v. Munday, 112 N. C. 816, 17 S. E. 583, and Wyman v. Taylor, 124 N. C. 426–428, 32 S. E. 740, as well as the case of Harshaw v. Taylor, 48 N. C. 513, 514, that the Cherokee lands were never regarded as subject to entry as the public lands of the state, prior to 1854–55, and even then it was provided that they were not to be entered as the public lands, but only "according to the laws in relation thereto." Chapter 18, p. 44, § 31, Pub. Laws 1854–55. The same provision was made in Rev. Code 1856, c. 42, § 31, and this was not changed until the present Code was adopted, in 1883. 2 Code, c. 11, § 2478. And in the case of Brown v. Brown, 103 N. C. 217, 8 S. E. 113, involving the very point under discussion, it is said:

"These enactments make manifest the settled purpose of the Legislature not to allow any lands while they continued in force, within the boundary prescribed of the lands set apart to and for the Cherokee Indians, to be subject to entry and grant. The terms employed to express such purpose are strong, unequivocal, and mandatory. Such entries and grants are expressly forbidden, and if such entries were made or grants issued, they were declared to be utterly void. * * * Indeed, such purpose appears in all subsequent legislation in the state in respect to the Cherokee Indians and Cherokee lands, a fruitful subject of legislation."

This case was reheard (Brown v. Brown, 103 N. C. 221, 9 S. E. 706), but it will be seen that the opinion from which the above excerpt is taken was only changed in respect of the land lying east

of the Meigs & Freeman line, and because of the act of 1794 (Potter's Revisal, c. 422; Haywood's Manual, p. 188), which provided that:

"All the lands in this state, lying to the eastward of the line of the ceded territory, shall be deemed and considered as coming within the meaning and provision of the said act," etc.

This same case was before the Supreme Court again (106 N. C. 451–460, 11 S. E. 647, 650), and the opinions of the court above referred to were distinctly reaffirmed. As already said, it was everywhere recognized, both by the legislative and judicial departments of the state government, that the Cherokee lands formed a special land fund, to which general legislation relating to the public lands of the state had no application, but that there was a body of special positive law by which the disposal of the Cherokee lands was to be controlled, and without a compliance with which entries and grants were not merely irregular, but utterly void, so "utterly void" that the courts appear to have declared them so whenever and wherever and in whatever kind of action they were offered as evidence of title or otherwise relied on. The legislative acts and the decisions of the Supreme Court construing the same not only recognized and gave effect to this body of special and positive law, but they also held that this law was complete and wanting in nothing that was essential to full and complete disposal of any part of said lands, without the aid of any provision of any statute of a general nature relating to the public lands of the state. The courts, too, were uniform in holding that any one claiming title to any of the Cherokee lands had the burden of showing to the court that the requirements of the special law had been complied with in all particulars, in order to support his title. On the rehearing in Brown v. Brown, 103 N. C. 221, 9 S. E. 706, the court came reluctantly to the conclusion that the act of 1794 (1 Potter's Revisal, c. 422), amendatory of the act of 1784 (1 Potter's Revisal, c. 202), had the effect to open to entry and grant "all lands lying to the eastward of the line of ceded territory," which line the court construed to be the dividing line between this state and the state of Tennessee. Page 223 of the 103d volume of reports, to foot of page 224, 9 S. E. 706, 707.

The act of 1784 empowered surveyors to include many entries in one survey, and the act of 1794 extended this authority to "all the lands in the state lying to the eastward of the line of the ceded territory." The "ceded territory" is held by the court to be the territory ceded by this state to the United States. In this way the court felt justified in sustaining the validity of the Allison grant, dated November 29, 1796, for 450,240 acres of land. This land lay east of the Miegs & Freeman line. Brown v. Brown, 103 N. C., foot of page 213, 8 S. E. 111. On the rehearing (103 N. C. 224, 225, 9 S. E. 706, 707), the court shows that the act of 1783 (1 Potter's Revisal, c. 185) was re-enacted by the act of 1809 (1 Potter's Revisal, c. 774) so far as lands lying west of the Miegs & Freeman line "within the bounds of this state" were concerned. But the

court, when the Brown Case was before it again (106 N. C., at page 457, 11 S. E. 647) said:

"We think it settled in this case (103 N. C. 221, 9 S. E. 706) that the Allison grant was valid to convey the state's title to the lands embraced therein, lying east, and not west, of the Meigs & Freeman line."

This, though not just what the court had previously held, was undoubtedly correct, for the act of 1783 was brought forward in 2 Rev. St. p. 188, as an unrepealed statute, and it also appears in the present Code as sections 2346–2348. In the investigation of this case, aided as the court has been by the able and thorough argument of counsel, we have not been able to find any decision that even intimates that any of the special laws in relation to the Cherokee lands have been repealed. In Brown v. Brown, 106 N. C., at page 454, 11 S. E. 647, it is said that whether the old act of 1783 was repealed by implication by chapter 42, § 1, of the Revised Statutes, need not be considered. It was not and could not be contended that said act had ever been expressly repealed, and if that act had been repealed by implication by chapter 42, § 1, Rev. St., there would still remain all the other legislation in relation to the Cherokee lands untouched by any general law. But repeal by implication is never favored, and it is never allowed if it be possible to avoid it. The cases in North Carolina on this subject are: State v. Woodside, 31 N. C. (9 Ired. Law) 496; Simonton v. Lanier, 71 N. C. 504; State v. Cunningham, 72 N. C. 477; State v. Rivers, 90 N. C. 739; State v. Sutton, 100 N. C. 474, 6 S. E. 687. It is certain there is no affirmative character in the part of chapter 42, § 1, Rev. St., relied upon as a repeal of the whole policy of the law in relation to the Cherokee lands. That part is a mere exception. That section forbids the entry of Cherokee lands generally. The statutes in reference to the Cherokee lands are public and local, and form a kind of public and local Code. It has already been shown how the exception in section 1 of chapter 42 may be given effect under this local Code. State v. Chambers, 93 N. C. 600.

Courts take judicial notice of public local statutes. State v. Cooper, 101 N. C. 688, 8 S. E. 134. The case of Jarrett v. Kingzey, 48 N. C. 488, is a direct authority to the effect that one entering part of the Cherokee lands was bound to comply with the special laws in relation thereto. We think that a consistent and proper construction of the exception in chapter 42, § 1, Rev. St., is that it was not intended to repeal any previous law, but was put in only to prevent repealing laws already in existence for the disposal of such lands. The Cherokee land laws did not prevent the entry of those lands, only in so far as the general law of the state in relation to the entry and grant of the public lands of the state was concerned. It was consistent with the special laws that any person allowed to acquire such land might take such action as would give him priority of claim to such portion as he desired to obtain a grant for. But, whatever might have been the law prior to the act of 1848–49, pledging the Cherokee lands to the building of the western turnpike road, it is plain that after that act a grant of any portion of those lands could be obtained only through a compliance with the method pro-

vided by the special laws in relation to the Cherokee lands. On the question of repeal by implication, all the authorities in the various states of the Union will be found collected in 26 Am. & Eng. Ency. of Law (2d Ed.) p. 720 et seq. For decisions of the Supreme Court of the United States, see Indexed Digest, vol. 2, p. 1497.

But there is another view of this first objection that we regard as fatal to the plaintiff's contention. Chapter 42, § 1, Rev. St., does expressly forbid the entry of lands lying westward of the Meigs & Freeman line. This is the positive, affirmative part of the statute. Is it possible to conclude that the Legislature regarded this as a substitute for the "Cherokee Land Laws," or that it amounted to a revisal and re-enactment of those laws, as contemplated by section 2 of chapter 1 of the Revised Statutes, to say nothing of the positive declaration of section 8 of chapter 1 of the Revised Statutes that "no act of a private or local nature" was to be considered as included among the repealed statutes, and to say nothing of section 10 of chapter 1 of the Revised Statutes, giving the commissioners power to bring forward unrepealed laws in a second volume of the Revised Statutes? 2 Rev. St. p. 188 et seq. But, suppose the words "except the vacant and unsurveyed lands" were intended to open this class of the Cherokee lands to entry, under chapter 42 Rev. St. In this event we have a special law in a general law, and before an entry taker would be authorized to receive the entry he would have to see that the same was of the "vacant and unsurveyed" class of lands, and when he issued his warrant to the surveyor of his county he would have to direct him to survey lands of the "vacant and unsurveyed" class, and before the Governor and Secretary of State would be authorized to issue the grant it would be necessary that the entry taker's warrant and the survey should show on their face that the lands were of the "vacant and unsurveyed" class, and before this grant would be received as evidence in any court, after it was admitted that the land was a part of the Cherokee lands acquired by the treaties of 1817 and 1819, and lay to the westward of the Meigs & Freeman line, the party offering and relying upon its validity would have to show, not by evidence aliunde, but by the grant itself, that the land was of that class of Cherokee lands made subject to entry by virtue of the exception in chapter 42, § 1, Rev. St.

The plaintiff, in the case at bar, admits that his entry was made under the authority of chapter 42, § 1, Rev. St., the general law in relation to entries and grants, and that the lands lay to the westward of the Meigs & Freeman line, and were of the lands commonly known as and called "Cherokee Lands." The entry of these lands is expressly forbidden by this general law, "except the vacant and unsurveyed." The plaintiff did not offer to show that the lands embraced by his grant were of the "vacant and unsurveyed" class. Take the case of the statute of limitations. It excepts infants and married women; but, if a disability is relied upon, its existence must be shown by the party claiming the benefit of it. Miller v. Bumgardner, 109 N. C. 416, 13 S. E. 935. Again, the authority of the entry taker in respect of the Cherokee lands was special, and

confined to the "vacant and unsurveyed," and his authority must be shown by the party asserting it. Harshaw v. Taylor, 48 N. C. 513. In Ross v. Duval, 13 Pet. (U. S.), near foot of page 61, 10 L. Ed. 51, it is said:

"The rule is well settled that, to avoid the statute, a party must show himself to be within its exception."

Now, as to the second objection to the grants offered as evidence by the plaintiff; the grounds being that said grants, with the papers attached thereto as part thereof, show that the land was entered by the grantee on the 26th day of July, 1852, in the book of the entry taker of Macon county, as land lying and being in said county, whereas on said date of said entry said land did not lie in said county, but in the county of Jackson, which last-named county was created by an act of the General Assembly of North Carolina, ratified the 29th day of January, 1851, and it was not then lawful to enter said land in said county of Macon. An entry taker is a creature of the statute, and his duties and authority are prescribed and limited by the statute. At the date in question, July 26, 1852, the law was that "the justices of the peace of the county may, when they deem it necessary, elect one * * * person to receive entries of claims for lands within such county." 1 Rev. St. 1837, c. 42, § 4. By chapter 68, p. 119, Pub. Laws 1848–49, an entry taker was required "to keep his office at the courthouse of his county, or within one mile thereof, under penalty of one hundred dollars and the forfeiture of his office." So it appears that it was only when the justices deemed it necessary they were authorized to appoint an entry taker. Surely the Legislature had the power to omit to provide for an entry taker's office and an entry taker for a new county as long as it deemed it unnecessary to make such provision. Now, as an entry taker possessed only such authority as the statute gave him, and as no such authority was given the entry taker of Macon county to receive entries of land lying in Jackson county, it follows that the plaintiff's entry, if it was of lands lying in Jackson county, was void. We have found no authority for the issuance of a warrant of survey by the entry taker of Macon county to the surveyor of Jackson county. The case of Harris v. Norman, 96 N. C. 59, 2 S. E. 72, and the cases there cited, are all that are necessary to cite upon this second objection to the grant.

From the grant and the paper attached and made a part of it, we must conclude that the entry was received and entered upon the entry taker's book of Macon county, by the entry taker of that county. As that officer had no authority to receive and record an entry or claim for lands not lying in his own county, it may well be presumed that the land mentioned in the entry was described as lying and being in Macon county; but that such was the description of the land is made clear by what is recited in the surveyor's certificate attached to the grant, viz.:

"By virtue of a warrant from the entry taker's office of Macon county to the surveyor of Jackson county, transmitted No. 6,757, entered the 26th day of July, 1852, I have surveyed six hundred and forty acres of land in the county of Jackson, in which said land now lies."

Why should the surveyor say "now lies," except to show that "then," when the entry was made, it was at least supposed to lie in Macon county? This certificate of the surveyor is referred to in the body of the grant:

"Entered the 26th day of July, 1852, as by the plat heretofore annexed doth appear."

It is insisted by plaintiff's counsel that the act of 1851 (Pub. Laws 1850–51, p. 99, c. 39) is broad enough to include the entry taker of Macon county. The act is entitled "An act providing for the administration of public justice in the county of Jackson." The first section provides:

"That the superior courts of law and equity and courts of pleas and quarter sessions for the counties of Haywood and Macon, respectively, shall have the same jurisdiction in all matters pertaining to the administration of public justice, within the county of Jackson, as said county heretofore had and exercised therein."

Now, certainly, the entry taker was not any one of the courts mentioned, nor was he in any way connected with any of said courts, and he was not affected by the first section. The second section declared that:

"The justices of the peace, constables, and other public officers, heretofore appointed and living within the territory of Jackson, shall have and exercise the same powers and privileges and be subject to the same penalties and amenable to the same tribunals as heretofore."

By the third section of this act the sheriffs of Macon and Haywood counties were empowered to act in their official capacities in the county of Jackson. From these several provisions the counsel for plaintiff argues that it was the purpose of the Legislature to give the county officers of Macon and Haywood complete authority in the new county of Jackson until such time as the government of the last-named county should be fully organized. This position is conceded to be true as to the Macon and Haywood officers named in the act, for the Legislature in express terms conferred upon them the authority.

A strong argument against the plaintiff's contention is that when, by the second section of the act, the Legislature conferred authority upon justices of the peace, constables, and other public officers to perform official functions in the new county, the power was confined to such of these officers as were living within the territory of Jackson. It has not been shown, nor even suggested, that the entry taker of Macon county was living within the territory taken from that county in the formation of Jackson. The court is thus confronted by a statute empowering certain officers by name and others as a class to perform official duty in the county of Jackson. Neither those named nor those living in the territory of Jackson county include the entry taker. The court is powerless to supply this omission, for its authority extends only to the construction of the act as written, and it cannot assume to add new features to the act or to enlarge the scope of its operation. It is true that the entries, warrants, surveys, and grants are official acts, and a presumption arises, in favor of their due execution, that everything

was rightly and duly performed. But this presumption is fully rebutted by the face of the instruments themselves and the facts shown in connection therewith.

The plaintiff having admitted that his recovery depended wholly upon the validity of the grants offered in evidence, the court, being of opinion that the entries on which the grants were issued, together with the grants themselves, are void, so instructed the jury, and directed a verdict for defendants.