From Morgan.
To determine the questions arising in this case, it is necessary to consider the titles under which each party claims the land in dispute. The Legislature of this State in 1783 passed an act declaring "that all the lands comprehended within a line described in section 5 of said act shall be and are hereby reserved unto the Cherokee Indians and their nation forever," and in section 6 of said act further declaring "that no person shall enter and survey any lands within the bounds set apart for the Cherokee Indians under the penalty of £ 50; and all such entries and grants thereupon (if any such should be made) shall be utterly void." The defendant claims title to this land under a grant issued by the State of North Carolina to John Carson, bearing date on 8 December, 1787, whilst the above recited act was in full force, and before any treaty was made with the Cherokee Indians by which they surrendered or relinquished any of the rights reserved to them by the act of 1783. It has (164) been determined by this Court, in Strother v. Avery (not reported), that a grant obtained under circumstances like the present is utterly void, and can convey no title to the grantee, upon two grounds: first, because the words of the act are imperative and declare the grant to be utterly void; and, secondly, because the officers of State were not authorized to issue grants for lands of this description; the State having by the act of 1783 divested itself of all title to the same. But it is contended that although the grant be void, yet a court of law will not receive parol evidence on a trial in ejectment to show the grant void, but recourse must be had to a court of equity, or to the mode of proceeding prescribed by the act of 1798, ch. 7, establishing the court of patents. This Court entertains the opinion that it has always been competent for a court of law to receive parol evidence of the location of each tract of land described in a grant, and that in many cases it is *Page 127 
only by such kind of testimony a grantee can show the situation of the land mentioned in the plaintiff's declaration or in defendant's grant; and wherever it is shown that the land claimed by the defendant is situate within the bounds allotted to the Indian Nation, then the grant becomes ipso facto void; it requires no act to be done, no ceremony to be performed to avoid it, but it is of itself a mere nullity. Besides, it is competent for a court of law at all times to receive parol evidence to show that the officers of State, who have signed and attested the grant, were not authorized or empowered to issue a grant for lands of a particular description; for if they exceed the authority delegated to them by law, their acts have no force nor validity; and would it not be absurd to say that a grant issued by an individual not known as an officer of the Government, and clothed with no authority, could not be declared void in a court of law, but that recourse must be had to a court of equity? Grants of this description differ essentially from those where the officers had the power and authority by law to issue the grant, but which grant may have been obtained irregularly and without conforming to the requisites (165) prescribed by the act of 1777, which irregularity and want of conformity might render the grant voidable by the person injured thereby. Upon this difference courts of law have heretofore founded their decisions. In the first class of cases they have received parol evidence and declared the grants void. University v. Johnson, 2 N.C. 373. But in the second class of cases where the grant has been irregularly issued, they have said that the party wishing to avoid it must apply to a court of equity; that it would be productive of the most dangerous consequences to avoid it by parol testimony. Reynoldsv. Flinn, 2 N.C. 107. The present case falls within the description of the first class of cases, and it is sufficient to say that in this case and between these parties, and on a title like the defendant's, a court of law will receive parol evidence and declare such a grant void, without deciding the general question or any other than the one submitted.
Having declared the power of the Court, upon a trial at law, to receive evidence to show the defendant's grant to be void, we are next to determine how far the title of the lessor of the plaintiff will enable him to recover. He claims title under a grant from the State of North Carolina bearing date 19 May, 1803, and founded on an entry made in 1791. To ascertain the validity of this grant, it may be necessary to take into view some proceedings of the General Government as well as of the *Page 128 
Legislature of this State relative to the lands allotted to the Cherokee Indians by the act of 1783. The first and most important is the treaty made by William Blount with the Cherokee Indians, on 2 July, 1791, William Blount then being Governor of the territory of the United States south of the River Ohio and superintendent of Indian affairs for the southern district. By the fourth article of this treaty it is declared (166) "that the chiefs and warriors of the Cherokee Nation, for themselves and the whole Cherokee Nation, their heirs and descendants, for a consideration therein expressed, release, quitclaim, relinquish and cede all the land to the right of the line therein described." And within the bounds thus ceded is the tract of land in question. In 1791 the Legislature of North Carolina passed an act declaring "that a part of Rutherford and Burke counties should form a separate and distinct county by the name of Buncombe," and particularly describes the boundary lines of said county, which lines include the land covered by the plaintiff's grant. It is further declared by the said act, "that the justices of Buncombe shall have the same powers and jurisdiction as the justices of the peace have in any other county in this State." By the provisions of the act of 1777 (Iredell Rev., 292), it is made "the duty of the justices of the peace of each county to elect an entry-taker, who shall receive entries for any lands lying in such county which have not been granted by the crown of Great Britain or the Lords Proprietors of Carolina or any of them in fee before 4 July, 1776, or which accrued or shall accrue to the State by treaty or conquest." Under these provisions the lessor of the plaintiff, after the county of Buncombe was formed and the Indian claim extinguished by Blount's treaty, entered with the entry-taker of Buncombe County the land in question, and on 19 May, 1803, obtained a grant for the same. The validity of this grant is now to be decided, for the plaintiff in this action must recover by the strength of his own title, and not through the weakness of his adversary's. To the title thus adduced two objections are made by the defendant's counsel: first, that the act of 1783 remains unrepealed and in full force, and that section 6 of that act attaches to this grant with the same force as to the grant set up by the defendant; and, secondly, that by the treaty these lands were ceded to the General Government, and not to the State of North Carolina. As to the first objection, the answer is, that although the act (167) of 1783 has not been expressly repealed by the Legislature, yet it is effectually and substantially repealed by the treaty. The act of 1783 was evidently made to preserve *Page 129 
peace with that tribe of Indians who by the extension of frontier settlements had become near neighbors to the inhabitants of the western part of Burke County, which peace would probably be broken, and the advantages contemplated by the Legislature in this donation entirely frustrated, if any individual was suffered to interfere with the rights secured to the tribe by the act of 1783. But when that tribe of Indians voluntarily and for a valuable consideration surrendered up their claim, no injury could ensure to the Indians by entering those lands; for whether they were occupied or remained vacant was to the Indians a matter of indifference from the moment of the ratification of the treaty. The reason and policy of the prohibition contained in the act of 1783 ceased, and with it the prohibition itself. The second objection seems to be equally unfounded. These lands having once belonged to the State of North Carolina and having been granted by the State to the use of the Indian Nation, revested in the State when that use expired and the Indians released all claim to the same. No expression is used in the treaty to convey these lands to the General Government; and although the Indian title was extinguished by the General Government, it does not follow that the title rests in them, for since the adoption of the Federal Constitution the power of making treaties is surrendered by each State to the General Government, and through them alone Indian claims are to be extinguished; and these lands lying within the boundary of this State, acknowledged by the Federal Government when received into the Union, must remain the lands of this State until she cedes them away. Judgment must therefore be entered for the plaintiff.