Gaston, Judge.
 

 — The appellant in this case contends that the judgment below should be reversed, and a
 
 venire de novo
 
 awarded because of error in the Judge, in overruling certain legal objections taken on the trial to the title of the lessors of the plaintiff. These objections are, first, that the description in the deed of Yonah, or the Big Bear, to the ancestor of the lessors was vague, uncertain and insufficient to pass the land described in the declaration, and that this defect could not be supplied nor explained: 2ndly, that at the time of the delivery of the said deed, Yonah had no right to sell in fee simple, and that no title passed thereby. To enable us to form a correct judgment upon these alleged errors, it is necessary to examine the stipulations of the treaty between the United States and the Cherokees affecting the land in question, the proceedings under that treaty oh the part of Yonah and the officers of the United States, and the acts of our state legislature in relation to the subject-matter of the treaty.
 

 Previously to the 27th of February, 1819, the tract of land, which is the subject of the present controversy, with a large territory around it, was a part of the domain of North Carolina, subject however to the right of the Cherokee Nation to occupy and enjoy it. On that day articles of convention were agreed upon between the secretary at war, acting on the part of the President of the United States, and certain chiefs and headmen of the nation; which articles of convention were submitted to the Senate of the United States, as a treaty, and on the 10th of March, 1819, were, with the advice and consent of the Senate, accepted, ratified and confirmed by the President. By the first article of this treaty, the Cherokee Nation cedes to the United States all their lands, lying north and east of a certain line, which
 
 takes in
 
 this territory. By the second article, the United States agree to pay, according
 
 *68
 
 to the stipulations of a former treaty of the 8th of July, 1817, for all improvements on the land lying within the ceded country, which add real value to the land; and do agree also to allow a reservation of six hundred and forty acres to each head of any Indian family, residing within the ceded territory, (those who enrolled themselves for removal to the Arkansas excepted) who chose to become citizens of the United States in the manner stipulated in the treaty of July, 1817.
 

 By the third article, it is declared as follows, “ It is also understood and agreed by the contracting parties, that a
 
 reservation in fee simple
 
 of 640 acres
 
 square
 
 (with the exception of Major Walker’s, which is to be located as hereinafter directed), to include their improvements, and which are to be as near the centre thereof as possible, shall be made to each of the persons whose names are inscribed in the certified list annexed to this treaty, all of whom are believed to be persons of industry, and capable of managing their property with discretion, and have with few exceptions made considerable improvements on the tracts reserved. The reservations are made on the condition that those for whom they are intended shall notify in writing to the agent for the Cherokee Nation, within six months after the ratification of this treaty, that it is their intention to reside permanently on the land reserved.”
 

 Among the persons whose names are inscribed on the list annexed to the treaty, are “ Yonah or Big Bear,” and “ Richard Walker,” and these are the only ones residing within the limits of this state. On the 16th of May, 1820, the commissioner and surveyor made out and issued to Yonah a proper certificate of survey of his reservation of 640 acres, corresponding with the definite metes and boundaries of the tract set forth in the declaration. By a deed of bargain and sale, bearing date the 1st of November, 1819, but delivered the 1st November, 1820, Yonah conveyed, or pretended to convey in fee simple to the ancestor of the plaintiff’s lessors, “ a reservation in fee simple of 640 acres of land, allotted and reserved to the said Yonah, by the treaty between the United States and the Cherokee Nation, as a perpetual inheritance, including
 
 *69
 
 his improvements, whereon he now lives, and has resided for some time past, situate, lying and being on both sides of Tuckaseejah river, and including an old town called Tuckaleechy; — the aforesaid reservation of 640 acres of land situate as aforesaid, hereafter to be laid off, and run and marked according to the provisions and stipulations of said treaty, with the appurtenances and hereditaments thereunto belonging, and all and singular the right, title interest and property of him, the said Yonah, as well from his original right of inheritance of perpetual occupancy, as one of the chiefs of said nation, as his right acquired from the United States, by the reservation aforesaid.” On the 8th of September, 1824, Yonah, by deed of bargain and sale conveyed or pretended to convey to the defendant the tract of land, according to the metes, marks and boundaries as set forth in the certificate of survey, and in 1825 or 1826 he died and left no heirs. At the first session of the legislature of North Carolina, after the treaty, held in the winter of 1819, an act was passed, providing for the survey and sale of the lands recently acquired by treaty from the Cherokee Nation. In this act nothing is said with respect to the reservations. In the winter of 1820, an act was passed authorising the sale of so much of the lands lately acquired by treaty from the Cherokee Indians as have been surveyed, and remain unsold; and at the same session another act, whereby it was declared, “ that it shall not be lawful for any white man to buy, rent, lease or cultivate any of the lands reserved to the Cherokee Indians by the late treaties in 1817 and 1819, nor to act as agent, attorney, or trustee, in buying, renting, leasing or cultivating such lands, and any persons violating the provisions of this act, shall forfeit #500, to be recovered in any Court having cognizance of the same, the one half to any person suing for the same, and the other half to the state; provided, nevertheless, that this act shall not extend, or be construed so as to prevent Richard Walker and the Big Bear from managing the lands allotted to them, as they think proper.” In 1821, the legislature passed an act, exempting from the restrictions and penalties of the preceding act, persons who have
 
 *70
 
 purchased from the state lands reserved for Cherokee Indians, and who have bought out or may buy out the right of the Indians thereto; and also another act autho-rising further sales, and directing the commissioner for that purpose appointed, to ascertain and report to the treasurer the sections of land in dispute between Indians claiming under the treaties, and persons who have purchased from the state; ordering the treasurer thereupon to forbear from collecting the bonds of such purchasers, until the controversy shall be decided by the proper tribunal, and directing him further to refund the purchase money and interest to such persons as may be ejected by ■the Indians. In 1823, 24, 25,26 and 27 acts were passed appointing commissioners to contract for the purchase by the state from the Indians of the tracts to which it may be believed they have a good title under the treaty, ratifying certain contracts of purchase made accordingly by the commissioners, giving relief to purchasers from the state when the tracts bought shall appear to have been materially interfered with by Indian reservations, directing that no reservation secured by treaty to any Indian shall be surveyed or sold, and appointing a new commissioner to inquire into the rights of certain tracts claimed by individuals of the Cherokee Nation, under the provisions of the treaties of 1817 and 1819, and authorising the commissioners to contract for the purchase of such of those tracts as he believes the said Indians have a good title to.
 

 In support of the first objection which was taken below to the plaintiff’s recovery, it has been argued here on the part of the appellant, that the deed from Yonah to Belk, cannot pass an estate in the
 
 land
 
 described in the survey and declaration in ejectment, in the first place, because it does not purport to convey
 
 that
 
 estate such as it was after it had become definite and complete by the survey, but only his right to a reservation of six hundred and forty acres under the treaty, before that right had become an estate in a particular and defined tract; and secondly, because the land described in that deed does not appear, and could not by the Court be declared to be, the same with that set forth in the survey and the declaration of
 
 *71
 
 ejectment. The Court is of opinion that the first part of this objection cannot be sustained.
 

 It is admitted on all hands that a deed, if it operates at all, must operate upon the subject-matter of it, such as it is at the time of delivery. When this deed was delivered, Yonah, for the purposes of this argument, must be assumed to have been the owner in fee simple of the particular tract of 640 acres described in the survey. The title to this tract he derived primarily from the reservation or grant in his favour contained in the treaty of 1819, and completed by the survey made in pursuance of the treaty. Before the survey he was proprietor of 640 acres to be laid off in a square form, so as to include his improvements in the centre. After the survey he was the proprietor of six hundred and forty acres actually laid off in a square, and marked and including his improvements in the centre. The general gift or reservation then became a particular gift or reservation. It was still the same reservation, but the same reservation more exactly defined. There existed no reservation nor right to reservation distinct from the reservation thus reduced to certainty. This reservation, with all the right, interest and property of Yonah therein, which must mean all his right, interest and property at the execution of the deed, he bargained and sold by that deed. But it is urged, that in describing the reservation, the deed adds, “ the aforesaid reservation of 640 acres situate as aforesaid, is
 
 hereafter
 
 to be laid off, and run and marked according to the provisions of the treaty,” which additiqnal description is utterly inapplicable to the tract actually laid off and run and marked according to the provisions of the treaty. And it is insisted, that although there may be no such reservation as that mentioned in the deed, and the consequence of the construction contended for is to deprive the deed of all operation, this consideration will not cause a thing to pass by the deed, which that deed did not profess nor purport to pass. As this argument is the foundation also of the second branch of the objection, viz. that the land declared to be conveyed by the deed is not the same which is described in the survey and declaration, it
 
 *72
 
 may be at once considered in its application to both parts of the objection. In answer to it the plaintiff’s counsel has submitted whether the deed may not be viewed in its
 
 description
 
 of the thing conveyed as referring to its character and condition at the time of the actual date of the instrument, although it operates to pass it, such as it is, at the execution of the instrument. As the whole purpose of describing the subject-matter of a conveyance is to designate and make it known, we have no doubt but that it may be identified by its past character or condition. But we do not discover any reference in the description contained in this deed to the character of its subject-matter at any antecedent day. The grantor speaks in the descriptive as well as in the bargaining part of the conveyance, in words of the present time. He sells what he has, in that which he describes as it is. Another answer, however, has been given, which we deem entirely satisfactory. The subject-matter of. the bargain is so completely ' identified by its name, by its localities, and by
 
 certain
 
 other marks of description, that the addition of another particular which does not apply to it nor to any thing else, creates no confusion, and must be rejected as having been inserted through misapprehension or inadvertence.
 
 Veritas nominis tollit errorem demonstrations.
 
 The subject-matter of the grant is Yonah’s reservation in fee simple of six hundred and forty acres of land allotted and reserved under the treaty of 1819, including his improvements, whereon he now lives, and has resided for some time past, situate on both sides of Tuckaseejah river, and including an old town called Tuckaleechy. The document is exhibited of Yonah’s title. It is for six hundred and forty acres of land allotted under that treaty; it includes the improvements whereon he had lived before the date of the deed, and whereon he then lives. It is on both sides of Tuckaseejah river, and includes the old town called Tuck-aleechy. One of two conclusions is inevitable. Either the land described in this official document of title is the same with that bargained and sold in the deed, although the deed through mistake, and in a particular by no means essential to the designation of the thing granted, states it,
 
 *73
 
 not as run off and marked, but as thereafter to be run off and marked, or that the deed itself, notwithstanding all its solemnities, passes nothing, and was intended by the parties to pass nothing. We believe that the law does not hesitate in its choice between these alternatives, that it will reject the mistaken words of addition contrary to the real fact, and that the same rule of construction must obtain here as was sanctioned by the Court in
 
 Reddick
 
 v.
 
 Leggett,
 
 3 Murph. 543, and
 
 Proctor
 
 v.
 
 Pool,
 
 4 Dev. Rep. 370.
 

 In the discussion of the second objection made to the plaintiff’s recovery, many questions were extensively argued by the counsel which the Court deems it unnecessary to determine. Whatever may have been the nature of the Indian title before the treaty, or whatever may be the legitimating extent of the treaty-making power, it cannot be doubted but that the general government with the sanction of the state might grant portions of the ceded territory in fee simple to individual Indians. We hold it clear, that in the present case this grant was made, and that the state sanctioned the grant. It will be seen that by the second section of the treaty of 1819, the United States agree to allow a reservation of six hundred and forty acres to each head of an Indian family residing within the ceded territory (those enrolled for the Arkansas excepted) who may choose to become citizens of the United States, in the manner stipulated in the treaty of 1817. It may be that those words of reference characterise not only the method by which these heads of Indian families are to become citizens of the United States, but the nature of the estate which they are to take in the reservations. If so, it is admitted that it would be a perplexing matter to define this estate. By the 8th article of the treaty referred to, it is declared that in the reservations thereby given, the donees or reservees shall “ have a life estate, with a reversion in fee simple to their children, reserving to the widow her dower,” with a proviso “ that if any of the heads of families, for whom reservations maybe made should remove therefrom, then the right to revert to the United States.” But the third article of the treaty of 1819, which makes or
 
 *74
 
 allows reservations to the particular Indians named in the certified list is perfectly explicit as to the estate which they are to take in these reservations. It is to be “
 
 in fee simple,”
 
 that is, to them, their heirs and assigns forever, and the reservations are made to those in fee simple because
 
 they “
 
 are believed to be persons of industry, and capable of managing their property with discretion, and have with few exceptions, made considerable improvements thereon.”
 

 If the cession from the Indians within the chartered limits of this state, or any of the
 
 terms
 
 of that cession,
 
 needed
 
 the sanction of this state, we hold it to be indisputable that such sanction was given. From the promulgation of the treaty of 1819, which was the only one directly applying to lands within the limits of North Carolina, down to this day, we have enactments upon enactments of our legislature acknowledging the treaty, claiming the lands as ceded thereby, and making regulations in conformity to the stipulations of it. If the state could have been guilty of the perfidy to claim the benefit of the cession, and at the same time withhold from the Indians any part of the consideration of that cession, it is perfectly certain that she did not commit, nor meditate such a baseness. The review which has been taken of the various legislative acts on this subject, show a full and unequivocal acquiescence on her part in the treaty and its terms. The act of 1820, prohibiting white men from buying reservations, is a striking illustration of the spirit which actuated her throughout. It was manifestly intended to protect those donees or reservees who, as heads of families, had obtained reservations under the second article; the character of whose estate therein, it seems so difficult to define, while it expressly excepts the only reservations made in North Carolina, made by the third article, those to Richard Walker and the Big Bear. It is observable too, that in expressing this exception, there is a coincidence of phrase with the language employed in that article “
 
 managing
 
 their lands,” so remarkable that it scarcely could have been accidental. The deed to Belk was executed before the act of 1820 was passed; but
 
 *75
 
 Yonah’s power of alienation is in no manner derived from the act. It was incidental to the nature of his estate as a fee simple.
 

 Some criticisms were made, in the course of the argument, upon the import of the word “ reservation.” Treaties use indiscriminately as applicable to reservations the verbs “ give,” “ make,” “ allot” and “ allow.” Sometimes the form of expression is, reservations shall be given; at other times, shall be made and allotted; and at other times, allowed. It is demonstrable that the word reservation is used, not in a technical, but in a popular sense, meaning a part taken out of the whole, and applied differently from the residue.
 

 It has been also urged that the reservations made are accompanied by a condition of perpetual residence. We think not. A
 
 declaration
 
 of intent to reside permanently on the tract is made a condition precedent to the allotment of such tract; but that condition once performed, and the allotment made, the estate is in law absolute. If this be so, then it is said the United States or the state might be defrauded by a false declaration; to which it may be answered, that it was believed, full reliance might be placed in the sincerity of the declaration; and that no
 
 material
 
 injury would result even should this expectation prove ill-founded. But if a condition of perpetual residence were annexed to the grant of the estate, it is not for any individual to treat that estate as at an end, until the state shall have enforced a forfeiture for breach of the condition.
 

 On the whole the Court sees no error in the judgment below, and directs it to be affirmed.
 

 Per Curiam. Judgment affirmed.