* Note by CLARK, C. J., upon history of Indians in this State.
Judgment for defendant. Plaintiff appealed.
The facts sufficiently appear in the opinion.
(478) Action for recovery of land of the defendant, the "Eastern Band of Cherokee Indians." Besides other claim of title (the controversy as to which we do not find it neccessary [necessary] to consider), the defendant set up a deed from William Johnson, 9 October, 1876, to the Eastern Band of Cherokee Indians for the Qualla boundary of land, which, it is admitted, covers the land in controversy, which deed was executed in pursuance of a decree of the United States Circuit Court for the Western District of North Carolina, entered at November Term, 1874, in a cause therein pending, entitled "Eastern Band of Cherokee Indians v. W. H. Thomasand others."
Section 4, chapter 211, Private Laws 1889, entitled "An act incorporating the Eastern Band of Cherokee Indians," reads as follows:
"In all cases where titles or deeds have been executed to the said `Eastern Band of Cherokee Indians,' or any person or persons in any capacity in trust for them under that name and style, by person or persons, either collectively, individually, officially, or in any capacity whatever, such deeds or titles are hereby declared valid against the State, and all persons or any person claiming by, through, or under the State by virtue of any grant dated or issued subsequently to the aforesaid deeds or titles to the said `Eastern Band of Cherokee Indians.'"
The plaintiff claims title under eight grants issued to D. Lester, assignee of S. Everett, 4 November, 1891, based on entries made 15 March, 1880, surveyed 18 May, 1880, and purchase money paid 27 June, 1883. The grants under which plaintiff claims were issued subsequently to the above act, which was, in effect, a legislative grant, passing to the defendant the legal title as fully as the State could have conveyed it if the statute had directed the Secretary of State to issue a grant to defendant and this had been done.
This act did not impair, it is true, any rights of Lester, under whom the plaintiff claims. He had an equity, by virtue of his entry and payment of the purchase money, to call for a grant to perfect (479) his claim by the legal title. The relation was that of "vendor and *Page 349 
vendee, with all the rights and equities incident thereto." Frasier v.Gibson, 140 N.C. 278, in which it is further held by Connor, J., that a delay to call for the grant within ten years after the entry would presume an abandonment. As the entry under which the plaintiff claims was made 15 March, 1880, and the grant was not issued till 4 November, 1891, it would seem that the plaintiff's assignor was then barred of the right to call for a grant, especially in view of the legislative grant by chapter 211, Private Laws 1889, of the land to the defendant.
But, however that may be, the Johnson deed to the defendant was registered in Swain County, where the land lies, 8 July, 1880, the title thereto was confirmed by the aforesaid act, 11 March, 1889, and the plaintiff took no steps to recover the land or otherwise assert his equity till the summons was issued in this action, 13 July, 1903, more than twenty-three years after his equity had been acquired by the entry made by Everett, 15 March, 1880, nearly twenty years after the payment of the purchase money, 27 June, 1883, more than fourteen years after the legislative grant of the land, 11 March, 1889, and even more than eleven years after the plaintiff took out his grant, 4 November, 1891.
The plaintiff has the junior grant and not the legal title. In no view has he had any other right than an equity to call for the title, and, in any aspect, he is barred from now asserting this, by unreasonable delay, as well as by the lapse of ten years. Revisal, sec. 399, which statute is duly pleaded. Leges subveniunt vigilantibus non dormientibus.
What good reason caused the plaintiff, and those whose rights he has acquired, not to take steps to assert them during all those years, we know not. The law conclusively presumes that they were good and sufficient, and that those reasons could have been shown by the defendant, if the plaintiff had taken action in the reasonable time contemplated by the law, for men are not usually slow to assert claim to (480) property, if well founded. In the lapse of time witnesses die or move away, evidence is lost, facts are forgotten, documents are destroyed or mislaid. Therefore the law places time itself in place of that which it has destroyed. If time carries in one hand the scythe to destroy the muniments of our titles, he carries in the other the hour — glass to measure out the period of our protection.
In McAden v. Palmer, 140 N.C. 258, the defendant not only made the senior entry, but had the land surveyed and paid the purchase price before the plaintiff even made his entry; but as the latter obtained his grant and registered it first, it was held by Brown, J., that the delay of the defendant to assert his equitable right to have plaintiff declared a trustee for his benefit, for ten years after the registration of plaintiff's grant had vested the legal title in him, was a complete bar, by virtue of The Code sec. 158 (now Revisal, sec. 399), to the assertion of such *Page 350 
equity, citing Ritchie v. Fowler, 132 N.C. 790. To the same effect,Johnson v. Lumber Co., 144 N.C. 717.
The defendant's deed from Johnson, covering the locus in quo, was registered in Swain County, 8 July, 1880, and was validated by the act of the General Assembly, 11 March, 1889, and the plaintiff is barred by failure to assert his rights within ten years from the latter date. The plaintiff has at no time been in possession of the premises.
No error.
NOTE. — As a matter of both legal and historical interest as well, it may not be amiss to note here the uniform kindly treatment by this State of the Cherokees in her borders, of which the above act of 11 March, 1889, in confirming their titles, is in keeping. Long before the treaty-making power was surrendered by the States to the General Government (481) by the Constitution of the United States, North Carolina set apart to the Indians a large territory as a hunting ground, and forbade the entry and grant of the same. In 1777 the Blue Ridge was made their boundary line.
Then, in 1783, the territory described in the act, brought forward as section 2346 of The Code of 1883, was set apart to the Cherokees. This territory originally included a very large part of what is now the State of Tennessee. The next section of the act of 1783 forbade the entry and grant of these lands. Section 2347, Code of 1883. The courts held this reservation sacred to the Indians until the Indian title was extinguished by treaty with the United States. Strother v. Cathey, 5 N.C. 162. InEu-che-lah v. Welsh, 10 N.C. 155, it was held that Indians in possession under treaty need not take out any grant from the State. In Belk v. Love,18 N.C. 65, it was held that the treaty of 1819 did not require perpetual residence by the Indians on the lands reserved to them.
Under the terms of the treaty of New Echota, of 29 December, 1835, purporting to have been made between commissioners appointed by the United States and the chiefs and head men of the Cherokee Nation (though it is now generally believed that, in fact, there was no treaty at all, but it was enforced by the United States to avert war between the State of Georgia and the Cherokees in Georgia), the bulk of the Cherokee Indians east of the Mississippi were forced to move west, under display of arms made by Gen. Winfield Scott. The history of this treaty is given by John W. Powell, director of Smithsonian Institution, in a volume issued by the Government.
There was a remnant of the Cherokees, however, left in North Carolina without any organization. North Carolina, realizing the helpless and dependent condition of this remnant of a once powerful tribe, enacted legislation for their benefit. *Page 351 
Among others was the enactment which avoided all contracts (482) made since 18 May, 1838, for an amount equal to $10 or more, between Indians and white persons, unless reduced to writing and signed in the presence of two witnesses. This is now Revisal, sec. 975, and was cited in Rollins v. Cherokees, 87 N.C. 248. The North Carolina Cherokees were entitled to certain moneys, after the war, which the United States refused to pay over to them unless they moved to the Indian Territory, or secured an act of the Legislature of North Carolina allowing them to remain permanently in this State.
Such act was promptly passed by the Legislature. Laws 1866, ch. 54. During 1868 the North Carolina Cherokees endeavored to effect a tribal organization or constitution to live under. This was held invalid by the decision of the Supreme Court of the United States, in Eastern Band ofCherokee Indians v. United States and Cherokee Nation, West,117 U.S. 288. The Court held in this case that the North Carolina Cherokees who refused to go west with the tribe were not a nation, in whole or in part, and could not have a tribal organization, as they were citizens of North Carolina and bound by her laws. S. v. Ta-cha-na-tah, 64 N.C. 614. This has been cited in S. v. Wolf, 145 N.C. 440.
About that time it was found that a great many of the title papers of the Indians to the Qualla boundary and other lands had been lost or destroyed, without having been recorded. Under the decision of the United States Supreme Court, supra, it was doubtful whether these Indians had any capacity as an organization to sue and be sued or to hold lands conveyed to them as such. The Legislature of North Carolina again came to their relief and passed the act (Private Laws 1889, ch. 211) above quoted. See, also, chapter 166, Private Laws 1895, and chapter 207, Private Laws 1897, amendatory of chapter 211, Private Laws 1889, supra.
There is much in the history of the Cherokee Indians and (483) their conduct since their treaties with this State which deserves preservation. Junaluskah, the great Cherokee warrior, distinguished himself at the battle of the "Horseshoe," and General Jackson attributed largely to him the victory. In recognition, the Legislature of North Carolina bestowed on him the beautiful tract of land adjoining Robbinsville, in Graham County, now the property of George Walker, Esq. The Legislature has in recent years directed a monument to be erected over his grave.
It will also be recalled that when Tecumseh came south to organize a general confederacy of the Indians, he had swept the Cherokees into the movement had not Yeonaguskeh, by his earnest eloquence, recalled the warriors to fidelity to their treaty obligations with the whites.
CLARK, C. J. *Page 352 
BROWN, J., dissenting.
(484)