C. P. WESTON AND RICHMOND CEDAR WORKS v. JOHN L. ROPER LUMBER COMPANY.

(Filed 24 September, 1913.)

1. Deeds ·and Conveyances — Boundaries—Trials—Conflicting Evidence.

Where the question of the location of lands in dispute is determined by the location of a certain point named in the description of a deed, and the evidence is conflicting, the verdict of the jury thereon is controlling.

2. Deeds and Conveyances — Title — Lords Proprietors — Bill of Rights — Halifax Constitution — Lands Confiscated — State's Lands.

Section 25 of the Bill of Rights, prefatory to the Halifax Constitution of 1776, vested the property of the soil within the limits of the State, as there laid down, in the "collective body of the people," excepting only "the titles or possessions of individuals holding or claiming under the laws heretofore in force or grants heretofore made by George III. or his predecessors, or the late Lords Proprietors or any of them." Hence, whatever titles George III. or any of the Lords Proprietors retained in themselves, ungranted at that date, passed to the sovereign people of this State, and by chapter 1, Laws 1777 (24 St. Records, 43), became the subject of entry and grant. Therefore, those

who establish their title by mesne conveyances under a grant from the State under the act of 1777 of lands of Earl Granville ungranted by him at the time of the adoption of the Constitution of 1776, hold under a valid grant.

APPEAL by defendant from *Long, J.,* at January Term, 1913, of PASQUOTANK.

*Winston & Biggs, Ward & Thompson, Meekins & Tillitt, and Charles Whedbee for plaintiffs.*

*W. B. Rodman, A. D. McLean, W. M. Bond, and J. K. Wilson, for defendant.*

CLARK, C. J.  This case was here 160 N. C., 263.  The plaintiffs seek to recover a tract of 1,000 acres swamp land, under mesne conveyances from a grant to John Cowper in 1788, and damages for trespass thereon.  The question of title by adverse possession does not arise.  The defendant admits that it has cut timber on the land in controversy as alleged in the complaint, but denies that such cutting was wrongful or unlawful.

The defendant asked the court to submit an issue as to the true location.  This contention hinges upon these words, "then running up the river *to the head thereof.*"  The plaintiffs contend that the "head of the river" is at a certain point, and that if their contention is correct the tract will contain 1,026 acres, and the outline of its boundaries will coincide almost precisely with the plat and description in the survey of the Cowper patent 125 years ago, in 1788.  But that if the "head of the river" is where the defendant contends, the survey shows that there would be only 740 acres in the original grant, and that the outlines of the boundary will not correspond with said grant to Cowper. There was much evidence on this point, and the jury found in accordance with the contention of the plaintiffs.  We find no merit in the exceptions on this point, and we do not think it is necessary to consider in detail the other exceptions, most of which are in fact determined by the decision of this case, 160 N. C., 263.

The real controversy now before us turns upon this point, "Were the lands of John, Lord Carteret, Earl of Granville, subject to entry and grant in July, 1788?  The plaintiffs claim

under such grant and a complete chain of mesne conveyances to themselves. The defendant claims under a conveyance from the State Board of Education, 24 October, 1904, to George W. Roper, for 38,000 acres, including the *locus in quo* in consideration of $700. The plaintiffs contend that this is less than 2 cents per acre, and that the conveyance is therefore void, because Revisal, 4009, provides that the "State Board of Education . . . shall not sell swamp lands at a price less than 12½ cents per acre," and contend that at most this could be nothing more than a quitclaim or release of any interest the State board might have in said tract. We need not, however, discuss this point, if the grant to John Cowper in 1788 covered land which was then subject to entry and grant.

The real controversy, therefore, turns upon the proposition whether the lands of Earl Granville were confiscated, which confiscation was rendered invalid by article 6 of the Treaty of Peace with Great Britain in 1783, or became the property of the State as a consequence of Independence.

On 30 June, 1665, Charles II. granted to the eight Lords Proprietors all the lands from the present Virginia State line to the 31 degree north latitude. On September, 1744, George II. set apart to John, Lord Carteret, one degree of latitude southward from the Virginia line, the king having bought out the other seven Lords Proprietors. The southern line of Lord Granville's territory may still be traced in the southern boundary of the counties of Chatham (until the formation of Lee), Randolph, Davidson, Rowan, and Iredell. The Confiscation Act, ch. 17, Laws 1777 (2d Session), 24 State Records, 123, and Laws 1779, ch. 2; 24 State Records, 263, which was passed during the Revolution and which was not enforced, because in violation of the treaty, named the parties whose lands were confiscated, and among these the name of Lord Carteret does not appear. The Entry Act, ch. 1, Laws 1777 (2d Session), 24 State Records, 43, expressly withheld those confiscated lands from entry and grant, and the confiscation indeed was never enforced. The act authorized the entry and grant of all lands "which have not been granted by the crown of Great Britain, or

the Lords Proprietors of Carolina, or any of them, in fee before the first day of July, 1776, or which have accrued or shall accrue to this State by treaty or conquest."

It is clear from the above language that the lands which were still held by Lord Granville on 1 July, 1776, "had not been granted by him or any of the Lords Proprietors in fee, nor by the crown," and therefore those lands were subject to entry and grant. This was the cotemporaneous construction put by the Legislature on section 25 of the Bill of Rights, prefatory to the Constitution, adopted at Halifax in 1776. That section vested the property of the soil within the limits of the State, as there laid down, in the "collective body of the people," excepting only "The titles or possessions of *individuals* holding or claiming under the laws heretofore in force or grants heretofore made by King George III. or his predecessors, or the late Lords Proprietors or any of them." This is an explicit recognition that whatever titles George III. or any of the Lords Proprietors retained in themselves, ungranted at that date, had passed to the sovereign people of this State and by the subsequent act of 1777, above referred to, all such lands having become the property of the State, became the subject of entry and grant.

The point was directly presented to this Court in *Taylor v. Shuford,* 11 N. C., 116, and the Court held: "The sovereign power cannot be estopped. Where the king in 1768 granted lands to A. which he had previously granted to Lord Granville, the grant to A. was void; and *as the State succeeded upon the Revolution to Lord Granville's right to the land,* a grant made by the State since shall be preferred to the royal grant to A." It is true that when the seven Lords Proprietors conveyed their interest to the king, Lord Granville, while retaining his one-eighth interest in the land, released his right to participate thenceforward in the government. But that did not change the fact that he held the land in the capacity of a *quasi*-sovereign, as Lord Proprietor under the Patent of 1665, and as a coöwner with the king, though partition was made in 1744, and not as an individual. He continued to make grants till 1776.

The contention that the Earl of Granville did not hold the land in this *quasi*-sovereign capacity, but that he was a mere in-

163—6

dividual grantee, and therefore that his rights were protected from confiscation by the Treaty of Peace of 1783, was presented by an action brought in the United States Court for North Carolina in 1802 in the case of *Coventry v. State.* The contention of the heirs of Earl of Granville was not sustained, and they did not appeal, though they were represented by able counsel. The papers are still on file at Raleigh. Some years later Judge Gaston and Judge Duncan Cameron were employed to have the cause revived, but upon full consideration this was not done. We must presume that those eminent lawyers were satisfied that the contention of their clients could not be maintained. Indeed, though Granville had released to the king his right to share in the government, there was nothing to show that he changed in any wise the *quasi*-sovereign capacity in which he had held the lands. The title of the king as the grantee of seven Lords Proprietors was on exactly the same footing as the title of the one Lord Proprietor who retained his lands. All lands ungranted by the king or Lords Proprietors to individuals on 1 July, 1776, became the property of the sovereign State of North Carolina, without distinction.

This matter has been so long settled that indeed it now possesses only an antiquarian interest. If it were possible to change it, it would affect the titles in at least half the counties of the State, except for the protection afforded by the statute of limitations.

We, however, are fully of the opinion that the title of the Earl of Granville passed, like the title of the king, by the right of conquest, and that the new State Government became vested of the ungranted lands of the earl in this part of its territory in exactly the same plight and condition that it became vested with the ungranted lands in the rest of the State, *i. e.,* by conquest of the sovereign power.

It is scarcely necessary to discuss more fully this proposition. The other exceptions require no debate. The jury found that the boundaries of the land were as contended for by the plaintiffs, assessed the damages at $637.50 and held that the damages were not barred by the statute of limitations.

No error.