W. VANCE BROWN ET AL. v. GEORGE H. SMATHERS ET AL.

(Filed 10 September, 1924.)

1. **Public Lands—Indian Reservations—Cherokee Indians—State Grants— Void Grants.**

Under the provisions of statute in 1783, certain described land was reserved to the Cherokee Indian tribe, with express provision that no person should enter and survey the same within the bounds thus reserved, and that all entries of State lands and grants thereof from the State should be void; and *held*, those claiming title to these lands under a grantee from the State during the life of the statute, and before its repeal, acquired no title as against those claiming under a valid grant from the State after its repeal. The history of the rights of entry upon the Indian land from pre-Revolutionary times, together with the various statutes affecting them, applied by ADAMS, J.

**2. Same—Statutes—Interpretation.**

In construing the statute of 1783 as to lands reserved to the Cherokee Indians, as to whether certain lands granted by the State came within the boundaries of lands prohibited to be entered: *Held*, the State had the right for itself, and those claiming under it, to say and settle where the true boundary line was; and that portion which is west of the Meigs and Freeman line and north and west of the Blue Ridge range of mountains, and within the Indian boundary, was not subject to entry since the statute of 1783 and prior to its repeal.

**3. Same—Boundaries.**

In construing whether certain grants from the State fall within the description of the lands reserved to the Cherokee Indians, and therefore void under the statute: *Held*, the last call in the statutory description must be taken to the State's line in the shortest available direction which conforms to the description; and *held* further, that the grantee from the State during the life of the statute, or before its repeal, could acquire no title to lands falling within the boundaries of the lands reserved to the Cherokee Indians, thus construed, notwithstanding the mistake at the time that a certain parallel of latitude marked the boundary.

CONTROVERSY without action, to try title to land, heard by *Bryson, J.,* on facts agreed. From TRANSYLVANIA. Plaintiffs appealed.

Plaintiffs allege that they are the owners in fee and entitled to the possession of a part of the land embraced in a grant (No. 230) of 50,560 acres, issued by the State to George Lattimer, 20 July, 1796, and that the defendants wrongfully withhold possession. The grant is represented on the plat by 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, and the lines of the excepted part (not claimed by plaintiffs) extend from 1 to a stake on the top of the Tennessee Ridge, thence southwest with the ridge to the top of the Blue Ridge, thence southeast with the top of the Blue Ridge to a stake in the old Lattimer line, thence the various courses of the grant back to 1, the beginning. The *locus in quo* is so much of the land claimed by the Wolf Mountain Lumber Company as is embraced in the red lines in the northwest corner of the Lattimer grant.

Defendants deny plaintiffs' allegations, set up several defenses, and ask for affirmative relief. They allege that the land claimed by the plaintiffs was not subject to grant at the time the entry was laid or the grant issued, because it was then occupied by the Cherokee tribe of Indians, whose right of occupancy had not been extinguished by treaty or otherwise; that by an act of the General Assembly, passed in 1783, all entries and grants of the land occupied by the Cherokees were declared "utterly void," and that other acts were passed declaratory of the general policy of the State to prohibit the entry of any lands so occupied until the title or claim of the Indians had been extinguished. They allege that so much of the Lattimer grant as lies west of the

Meigs and Freeman line was not subject to entry until 1817 or 1819, when the General Assembly authorized a survey of land lying west of this line, and that by an act passed in 1835 the unsurveyed land situated between the Meigs and Freeman line and the Tennessee River was made subject to entry and grant; also, that practically all the land lying west of this line has been sold to sundry parties who obtained grants therefor in pursuance of the Cherokee land laws, and that the defendants claim title under grants thus acquired; that the Lattimer grant, according to course and distance, laps on about 1,100 acres owned by the defendant, Wolf Mountain Lumber Company, and derived from its codefendant, George H. Smathers. They ask that they be declared the owners in fee of the land in controversy; that plaintiffs' claim be declared a cloud on their title to the extent of the lappage, and that the plaintiffs be barred of any claim to the land in suit. The land conveyed by George H. Smathers to the Wolf Mountain Lumber Company is subject to the lien of a deed in trust executed by the lumber company to William M. Smathers, trustee, to secure certain purchase-money notes.

A jury trial was waived and the controversy was submitted for determination upon the following agreed statement of facts:

1. The plaintiffs claim title to a large area of land lying and being in the counties of Transylvania and Jackson, in the State of North Carolina, included in grant No. 230, issued by the State of North Carolina to George Lattimer on 20 July, 1796, and calling to contain 50,560 acres, and it is agreed that whatever title to the area in controversy passed from the State to George Lattimer by virtue of the grant aforesaid is now vested in the plaintiffs.

2. The defendants claim a portion of the area included in grant No. 230 under and by virtue of certain junior grants issued by the State of North Carolina, to wit, Jackson County grant, No. 190, issued by the State to J. T. Foster, 1 October, 1855; Jackson County grant, No. 191, issued by the State to J. T. Foster, 1 October, 1855; Jackson County grant, No. 193, issued by the State to J. T. Foster, 1 October, 1855, calling to contain 640 acres each; and Jackson County grant, No. 14126, issued by the State to C. B. Zachary *et al.,* 14 February, 1900, calling to contain 400 acres; the lappage of said grants on grant No. 230 including about 1,100 acres, about 75 acres of which lies on the south side of the Blue Ridge, on the headwaters of Toxaway River, and about 1,025 acres of which lies on the north side of the Blue Ridge, on the headwaters of Tuckaseegee River; and it is agreed that whatever title passed from the State of North Carolina by virtue of said junior grants is now vested in the defendants; and it is further agreed between the parties hereby that if no title passed by said grant No. 230 to

George Lattimer to the 1,100 acres of land in controversy in this action, the title passed by said grants Nos. 190, 191, and 193 to J. T. Foster, and grant No. 14126 to C. B. Zachary *et al.,* under whom the defendants claim title to the 1,100 acres of land in controversy, and that title to the same is now vested in the defendants as their interest may appear.

3. The map hereto attached and made a part of this agreed statement of facts correctly shows, for the purpose of this suit, the topography of the country, the ridges, mountain ranges, and streams; also, correctly shows the location of grant No. 230 and the area claimed by the defendants under said junior grants, together with the correct location of the line known as the Meigs and Freeman line, run for the purpose of locating the line of the Tellico treaty of 2 October, 1798, and referred to in the acts of the General Assembly for the State of North Carolina for 1809 (now Potter's Revisal, vol. II, ch. 774), and also of the line known as the Hawkins line, run for the purpose of locating the line of the treaty of Holston, dated 2 July, 1791; and also correctly shows the location of the 35th parallel, north latitude; and also the line between the States of North Carolina and South Carolina as now recognized, running from the Ellicott Rock eastwardly, as surveyed and located pursuant to the commission appointed by the State of North Carolina in 1803 and duly ratified by the General Assembly for the State of North Carolina, by the act of 1813; and, further, that the line shown on said map running from the Tennessee Bald south 27 degrees east to the southern boundary of this State, represents the most direct course from the Tennessee Bald to the southern boundary of this State, as surveyed and located by the aforesaid commission; and, further, that all distances, relative locations and all other data and information appearing on said map are correct.

4. The defendants, and those under whom they claim, have never had any actual adverse possession of that portion of the area claimed by them, lying on the south side of the Blue Ridge, on the waters of Toxaway River, but they, and those claiming under them, have listed and paid taxes on the land in controversy between the parties hereto for a long period of years, and the plaintiffs have not listed and paid the taxes on the said land for a long period of years.

5. It is further agreed that grant No. 226, issued and patented by the State of North Carolina to William Cathcart, 20 July, 1796, calling to contain 49,920 acres, shown on the map hereto attached, in red, and designated on said map in words and figures as follows: "Grant 226, to William Cathcart, 20 July, 1796," was made the subject of the decision of the Supreme Court of the United States in the case entitled *Lessee of Margaret Lattimer et al., Plaintiffs in Error, v. William Poteet, Defendant in Error,* reported in 14 Peters, U. S., p. 4, *et seq.*

6. It is further agreed that the plaintiffs now have pending in the Superior Court for Transylvania County various other actions involving the same controversy as that involved in this action; said action involving some 25,000 acres, and that the final determination of this action will to a large extent settle the controversy between the plaintiffs and the other claimants to areas lying within grant No. 230.

In the judgment his Honor construed the call, "thence along the dividing ridge between the waters of Pigeon River and Tuckaseegee River to the southern boundary of this State," as running with the summit of the Balsam range a southerly course to the terminus of the water divide designated on the map as "Tennessee Bald," thence along the Tennessee Ridge a southerly course to where the same intersects the summit of the Blue Ridge at the point designated on the map as "Cold Mountain," thence along the summit of the Blue Ridge a southeast course to the southern boundary of the State. It was held that the last line extends from this point to the beginning along the boundary of South Carolina and Georgia. His Honor adjudged that the *locus in quo* was within the territory reserved to the Cherokee Indians by the fifth section of the act of 1783; that the plaintiffs are not entitled to recover the land in controversy; that their claim is a cloud upon the title of the defendants and should be canceled; that the plaintiffs, and those claiming under them, be enjoined from asserting any claim, interest or estate in or to the lands in dispute, and from trespassing thereon, and that the defendants recover their costs. Plaintiffs excepted and appealed.

*Dayton Hunter and Ruffner Campbell for plaintiffs.*
*Merrimon, Adams & Johnston, George H. Smathers, and E. C. Ward for defendants.*

ADAMS, J. The appeal presents the two questions, whether the land in controversy, or any part of it, was subject to entry on 20 July, 1796, when the grant to George Lattimer was issued, and whether the disputed boundary of the land set apart to the Cherokee Indians under the act of 1783 (1 Potter, 435) extended southeast from Cold Mountain along the crest of the Blue Ridge to the southern boundary of the State, as adjudged, or southwest to the State line, as contended by the plaintiffs. The defendants say that the *locus in quo* is a part of the land allotted to the Indians, that it was not subject to entry at the date of the Lattimer grant, and that Lattimer therefore acquired no title. The plaintiffs contend that in 1794 the General Assembly, by a statute "amending and explaining" the act of 1783, authorized the entry and grant of the disputed land, and that in any event 75 acres of it, situated south of the Blue Ridge, were outside the reservation, and hence not

within the inhibition on which the defendants rely. The parties have agreed that whatever title Lattimer acquired by his grant is vested in the plaintiffs, and that if the State conveyed no title to Lattimer the title to the land in suit is vested in the defendants, who claim under grants issued pursuant to legislation following the treaty of 1819. By this agreement proof of a complete chain of title, or of possession under color, is made immaterial. As the defendants assail the Lattimer grant, it is essential to inquire into the relation that existed between the State and the Cherokee Indians at the time the entry was made and the grant was issued.

When the maritime powers of Europe discovered this continent they found it necessary to establish some principle by which, as between themselves, their respective rights should be determined, and they agreed that "discovery gave title to the government by whose subjects or by whose authority it was made, against all other European governments, which title might be consummated by possession." Accordingly, Great Britain granted charters to certain subjects who were associated for the purpose of carrying into effect the policy of the crown; and while these charters, or some of them, purported to convey the soil, they were generally understood to transfer only such title as the sovereign might rightfully convey. This, said *Chief Justice Marshall,* was the exclusive right of purchasing such lands as the natives were willing to sell. *Fletcher v. Peck,* 6 Cranch, 87, 143; 3 Law Ed., 162, 180; *Worcester v. Georgia,* 6 Peters, 515; 8 Law Ed., 483. So, before the Revolution, the colonists dealt with the Indians as a tribe or nation capable of holding property, and entered into treaties with them, defining their respective rights; but after the renunciation of colonial dependence, the soil was declared to be the property of the people who composed the State. And, although the policy of observing treaties "secured by any former or future legislature" was enjoined by the Constitution of 1776 (Declaration of Rights, sec. 25), North Carolina, after this time and before the adoption of the Federal Constitution, had the inherent right, except as affected by the Articles of Confederation, to conclude treaties with Indians living within her borders. *Weston v. Lumber Co.,* 163 N. C., 78. The Indian title, unless otherwise defined, was thus treated as a mere possessory right, or right of occupancy, unquestionable until it was extinguished by treaty, conquest, or voluntary cession. If extinguished, the title reverted to the State, for all "lands lying within the boundary of the State, acknowledged by the Federal Government when received into the Union, must remain the lands of the State until she cedes them away." *Strother v. Cathey,* 5 N. C., 162; *Eu-che-lah v. Welsh,* 10 N. C., 155; *Danforth v. Wear,* 9 Wheaton, 673; 6 Law Ed., 188; *Fletcher v. Peck, supra,* p. 143; *Brown v. Brown,* 103 N. C., 222, 223; *S. c.,* 106 N. C., 454.

In 1777 the General Assembly opened a land office and prescribed the method by which land in the several counties should be entered by citizens of the State. 1 Potter, 274. This act, repealed, reinstated, and several times amended, was followed by others setting forth more definitely the right of entry and grant pertaining to lands east and west of the mountains. 1 Potter, 274, 354, 372, 405, 408, 413, 415, 461, 463. At this time all that part of the region west of the Alleghanies which is now embraced within the boundaries of Tennessee was at least nominally under the jurisdiction of North Carolina. It was ceded by the Legislature to the United States in 1784 (1 Potter, 457), but the act was repealed and the matter was postponed until 1789, when a second act of cession was passed. 1 Potter, 599, ch. 299. In 1796 Tennessee was admitted into the Union, and a part of the Indian lands described in the act of 1783 was situated within the present boundaries of that State. This act (1 Potter, 435) provided (section 5) that the Cherokee Indians should have and enjoy a tract of land bounded as follows: "Beginning on the Tennessee where the southern boundary of this State intersects the same nearest the Chickamawga towns, thence up the middle of the Tennessee and Holstein to the middle of French Broad, thence up the middle of French Broad River (which lines are not to include any island or islands in the said river) to the mouth of Big Pigeon River, thence up the same to the head thereof, thence along the dividing ridge between the waters of Pigeon River and Tuckasejah River to the southern boundary of this State." The section further provided that this land should be "reserved unto the said Cherokee Indians and their nation forever, anything to the contrary notwithstanding." In section 6 it was enacted that no person should enter and survey any lands within the bounds thus reserved, and that all such entries and grants should be utterly void. 24 State Records, 478; The Code, secs. 2346, 2347.

The defendants contend, not that the Lattimer grant is void upon its face, but that the closing lines of the land described in section 5 extend from the head of Pigeon River along the Balsam range to the Tennessee Bald, thence along the Tennessee ridge to Cold Mountain, and thence southeast with the Blue Ridge to the southern boundary of the State; that the entire *locus in quo* lies within the reserved territory, and that the Lattimer grant was issued without authority of law. The plaintiffs admit that all the land in controversy is west of the Meigs and Freeman line, and that so much thereof as lies north and west of the Blue Ridge (about 1,025 acres) is within the Indian boundary. If the part on the south of the ridge (75 acres) is within the Indian reservation, it must be disposed of in like manner with the remainder of the disputed land.

BROWN *v.* SMATHERS.

Insisting upon the validity of the Lattimer grant, the plaintiffs contend that the act of 1783 (construed in *Avery v. Strother,* 1 N. C., 558, and *Strother v. Cathey, supra*) was amended or superseded by the "four-line statute" of 1794, which is as follows: "An act to explain and amend an act entitled 'An act to empower county surveyors to make surveys and returns in the manner therein mentioned.' Be it enacted by the General Assembly of the State of North Carolina, and it is hereby enacted by the authority of the same, that all the lands in this State lying to the eastward of the line of the ceded territory shall be deemed and considered as coming within the meaning and purview of the said act." 1 Potter, 763, ch. 422.

The plaintiffs specifically contend that this statute was both amendatory and declarative; that it did not include all the land described in the act of 1783 or the land ceded to the United States, but that it did embrace all the land in the State situated east of the ceded territory, and not merely the portion reacquired in 1791 by the treaty of Holston.

The act of 1784 provided that surveyors might survey two or more entries as one (24 State Records, 565; 1 Potter, 458), and we now refer to it only to observe that even if the boundaries therein described covered the land reserved for the Indians by the act of 1783, there is no repeal of the fifth and sixth sections; and as the former act can operate upon lands not reserved, these sections cannot be held to have been repealed by implication. *Lattimer v. Poteet,* 14 Peters, 4, 14; 10 Law Ed., 328, 333.

The purpose and effect of the act of 1794, *supra,* have been pointed out in previous decisions. It was not referred to in *Brown v. Brown,* 103 N. C., 213. There it was held that land situated between Wolf and Tennessee creeks, within the original Indian boundary, was not subject to entry, and that even if the Indian title had been extinguished by treaty and reacquired by the State, it was yet the province of the Legislature to determine by statute how the State's title should be disposed of. As research had failed to discover a statute containing such a provision, the plaintiff's grant was held to be void. Upon considering a petition to rehear (103 N. C., 221) the Court held that the "four-line statute" of 1794, previously overlooked, embraced all the region in this State "lying to the eastward of the line of the ceded territory" (the Tennessee line, *Mendenhall v. Cassells,* 20 N. C., 43; *Brown v. Brown,* 103 N. C., 224) which had not been specially devoted to some particular purpose, and that its object was to subject to entry the land acquired from the Indians by the treaty of Holston. Powell's Report of the Bureau of Ethnology, 158. The former judgment was therefore reversed and a new trial directed. After the second trial, the case was again brought to this Court (106 N. C., 451), and it was then held that the

treaty of Holston, which was concluded 2 July, 1791, extinguished the Indian title to all lands east of the treaty line, the true location of which had been in dispute. The boundary began at the top of the Currahee Mountain and ran thence "a direct line to Tugalo River, thence northeast to the Occunna Mountain, and over it, along the South Carolina Indian boundary to the North Carolina boundary, thence north to a point from which a line was to be extended to the Clinch River," etc. It is contended that the last of these calls is designated on the map as the Hawkins line. But in the case last cited the Court held that the Legislature had power to construe the treaty and to declare where the disputed boundary was situated, and that the line theretofore in doubt was fixed and made certain by the Meigs and Freeman line. Powell's Report, *supra,* 174. In the opinion it was said: "The Meigs and Freeman line ascertained and fixed the hitherto uncertain line of boundary between the State and the Indians, and the line thus settled, so far as the State or any one claiming under it is concerned, ought not to be reopened. It does not change the Holstein or any other Indian treaty line, but the State had a right for itself, and all claiming under it, to say and settle where the true boundary line was, and this having been done by the act of 1809, the question should be at rest." 2 Potter, 1161, ch. 774.

The land in controversy is situated west of the Hawkins line and of the Meigs and Freeman line; and if we adhere to the former decisions of the Court we must hold that all that portion which is west of the Meigs and Freeman line and north and west of the Blue Ridge and within the Indian boundary (about 1,025 acres) was not subject to entry at the time the Lattimer grant was issued, and that the grantee acquired no title thereto.

But the plaintiffs say that the last appeal in *Brown's case* (106 N. C., 451) did not present the question whether the Allison grant was valid or void. Why not? Because, it is said, the Court remarked that the objections to the validity of the Allison grant "on its face" had been withdrawn. This indicates a misconception of the opinion, for it was further said that as the plaintiff had to rely upon seven years possession it was necessary to consider only those exceptions which related to the sufficiency of the grant to take the title out of the State, and to the sufficiency of possession under color of title. Possession of the land for seven years under color would have availed nothing in the absence of a valid grant. Whether the grant was valid was therefore one of the decisive questions, concerning which the Court said: "We think it settled in this case (103 N. C., 221) that the Allison grant was valid to convey the State's title to the lands embraced therein lying east, and not west, of the Meigs and Freeman line." In other words, the land

which was within the Indian boundary described in the act of 1783 and east of the Meigs and Freeman line was made subject to entry and grant by the act of 1794. Contrary to the plaintiffs' suggestion, it is perfectly obvious that this conclusion cannot be treated as a mere *dictum,* either in the opinion of *Mr. Justice Davis* (106 N. C., 451) or in that of *Mr. Justice Merrimon* upon the petition to rehear (103 N. C., 221).

In the next place, the plaintiffs contend that a part of the *locus in quo* (75 acres) lies south and east of the Blue Ridge, was not within the Indian boundary of 1783, and was therefore subject to entry and grant, without regard to the "four-line statute." Here the question is whether his Honor was correct in adjudging that the last lines of the boundary hereinbefore set out extended from the Tennessee Bald to Cold Mountain and thence with the ridge in a southeastern direction to the southern boundary of the State, for it was held in the first of the *Brown cases* (103 N. C., 218) that the treaty of Holston did not repeal or modify the statute forbidding the entry of land within this boundary. In their briefs the parties admit that the line extends from Tennessee Bald to Cold Mountain, but the plaintiffs contend that it runs from Cold Mountain to Great Hog Back, thence in a westerly direction along the ridge to the southern boundary of the State. This, the plaintiffs contend, is the main ridge, exceeding in altitude that along which the defendants say the line runs. They insist, moreover, that this ridge reaches the thirty-fifth parallel of latitude, which in 1783 was the southern boundary of the State, and that the ridge set out in the judgment falls short of the thirty-fifth parallel by eleven or twelve miles. Constitution of 1776, Declaration of Rights, sec. 25. This is true, but at that time the parallel referred to was generally assumed to be twelve miles north of its true position, and the assumed position was afterwards declared to be the southern boundary of the State. Powell's Report, *supra,* 182; 2 Potter, 997, 1013, 1062, 1131, 1280, 1318. Besides, if it be granted that the thirty-fifth parallel was the southern boundary, this fact, while a circumstance to be considered, would not necessarily be fatal to the judgment. *Sandifer v. Foster,* 2 N. C., 237; *Shultz v. Young,* 25 N. C., 385; *Long v. Long,* 73 N. C., 370; *Power Co. v. Savage,* 170 N. C., 625; *Millard v. Smathers,* 175 N. C., 56.

The appellants' contention that the ridge extending to the west from Cold Mountain divides the waters of the Tuckaseegee and of Pigeon River may be applied with equal if not greater force to the eastern ridge, as may be seen by reference to the map.

In the absence of controlling facts to the contrary, we apprehend that a proper interpretation of the act of 1783, defining the Indian reservation, requires that the last call be run from Cold Mountain to the State

line in the shortest available direction which conforms to the description of the land. In *Campbell v. Branch,* 49 N. C., 313, it is said: "Where the object designated has a considerable extension—as in the case of a river, swamp, or the line of another tract of land—then the disputed line must be run to the nearest point on said river, swamp, or line of another tract." With no less force should the principle apply when the designated object is a State boundary. So, if it be conceded that both ridges answer to the description—"thence along the dividing ridge between the waters of Pigeon River and Tuckaseegee River to the southern boundary of the State"—nothing else appearing, the line should run to the nearest point in the State line. The line, if run from Cold Mountain to the southwest, in accordance with the plaintiffs' contention, will be almost twice the length of the line which the trial judge approved as the proper boundary. Upon this point, also, we think the judgment of the lower court is correct.

The plaintiffs refer to several treaties entered into prior to the Declaration of Independence to show that the Indians had not been permitted to occupy territory south and east of the Blue Ridge after 1730. Minute discussion of the several treaties is not essential, but we may say that, after inspecting them, we are unable to concur in this conclusion.

The defendants have not appealed, and their reference to the act of 1794, as construed in *Brown v. Brown, supra,* upon the petition to rehear, need not be considered.

We find no error in the judgment.

Affirmed.